UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DIAMOND OFFSHORE COMPANY, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-11-1701 |
| | § | |
| SURVIVAL SYSTEMS INTERNATIONAL, INC., | § | |
| | § | |
| *Defendant.* | § | |

## ORDER

Pending before the court is (1) a motion to dismiss defendant Survival Systems International, Inc.'s ("SSI") counterclaims filed by plaintiff Diamond Offshore Company ("Diamond") (Dkt. 47); and (2) a motion for summary judgment filed by SSI (Dkt. 58). Having considered the motions, responses, replies, and applicable law, the court is of the opinion that Diamond's motion to dismiss should be GRANTED IN PART AND DENIED IN PART and SSI's motion for summary judgment should be GRANTED IN PART AND DENIED IN PART.

## I. BACKGROUND

This case arose from an accident occurring on May 17, 2010, in which a lifeboat aboard Diamond's Mobile Offshore Drilling Unit the *Ocean Ambassador* fell into the water during a lifeboat drill. Dkt. 31. There were four crewmembers aboard the lifeboat, two of whom did not survive the accident, and two of whom were injured. *Id.* Diamond contends that the lifeboat fell because the hooks holding the lifeboat up opened while the crewmembers were on board. *Id.* These hooks—Triple5 lifeboat hooks—were designed and manufactured by SSI. *Id.*

Diamond and SSI entered into several purchase orders for the purchase of the Triple5 lifeboat hooks. Dkt. 76. The purchase orders include a warranty that the goods that are the subject of the

purchase order are free from defect, of merchantable quality, and fit for the intended purpose for which they are purchased.  Dkt. 76, Exhs. 3, 4.  Diamond alleges that SSI represented that the Triple5 lifeboat hooks were "fail safe" and could not open when then weight of the lifeboat was on the hook.  Dkt. 31 & Exh. 2.  After the lifeboat accident, Diamond claims it revoked its acceptance of the Triple5 lifeboat hooks.  Dkt. 31.  Diamond also conducted an audit and subsequently issued an internal safety bulletin called a Flash Alert in which it noted that the Triple5 hooks on two other lifeboats were open more than the manufacturer's recommendation and that the release handles had shifted from a vertical position to a less than vertical position.  Dkt. 20, Exh. 1.  Additionally, Diamond paid the widow of one of the crewmen who was killed in the accident $2.75 million in exchange for a release of all liability from the accident.  Dkt. 76.

Diamond initiated this lawsuit on May 4, 2011.  Dkt. 1.  It claims that (1) SSI breached the multiple written contracts (the purchase orders) for the purchase of the Triple5 hooks; (2) SSI breached express and implied warranties relating to the hooks; (3) SSI was negligent and grossly negligent in the way it designed and manufactured the hooks; (4) SSI failed to warn Diamond about known risks associated with the hooks; (5) SSI knowingly or negligently made misrepresentations about the design, manufacture, operability, quality, and safety of the hooks; (6) SSI's representations or omissions about the hooks were fraudulent; (7) SSI fraudulently induced Diamond to purchase the hooks; and (8) SSI is strictly liable to Diamond, its employees and contractors, for the property damage, physical injury, and deaths that allegedly resulted from the allegedly unreasonably dangerous hooks.  Dkt. 31.  Diamond seeks a declaration that its revocation was proper, that any purported limitation to SSI's warranty of the hooks is void or not effective, that there is no limitation on SSI's liability, warranty or damages under the purchase orders, and that SSI is liable for the

alleged failure of the hooks. *Id.* Diamond also seeks, among other things, attorneys' fees, and all actual, direct, special, consequential, and incidental damages arising from its claims, including the losses from testing and replacing the Triple5 hooks, the lost profits associated with the failure of the *Ocean Ambassador* to operate during the investigations and other items associated with the accident, and the amounts it paid in settlement of claims associated with the injuries and deaths occurring because of the alleged failure of the hooks. *Id.*

SSI filed its answer and counterclaim on June 27, 2011. Dkt. 5. SSI asserted twenty-one counterclaims, including various tort claims associated with an alleged defamatory statement or statements made by Diamond relating to SSI's Triple5 hooks under California, Texas, Louisiana, and maritime law, and a breach of contract claim under Texas and Louisiana law. Dkts. 5, 15. On July 15, 2011, Diamond moved to dismiss the counterclaims, arguing that the allegedly defamatory statement—the Flash Alert—was, in reality, an internal safety alert that was completely true. Dkts. 8, 20. The court dismissed the defamation claims under California, Texas, Louisiana, and maritime law, finding that the alleged defamatory statement could not reasonably be construed as having a defamatory meaning. Dkt. 30. The court did not, however, reach the other claims, as it found the briefing provided on the other claims was incomplete. *Id.*

Diamond now moves for dismissal of SSI' remaining counterclaims, arguing that the court's finding that the statement in the Flash Alert was not defamatory necessarily precludes SSI's other counterclaims, which all rely on the Flash Alert as the alleged "wrongful conduct." Dkt. 47. SSI contends that Diamond's motion is too narrowly drawn and must be denied. Dkt. 54. SSI argues that the Flash Alert is only one example of Diamond's alleged wrongful acts and omissions. *Id.* SSI points out that the complaint actually discusses a "campaign to damage and discredit SSI and the

3

Triple 5 hooks in the maritime life-saving equipment community," and SSI contends that the Flash Alert was only part of that campaign. *Id.*

Additionally, SSI moves for summary judgment on all of Diamond's claims, asserting, as an issue of first impression, that federal law impliedly preempts Diamond's claims in their entirety because the claims involve maritime transport and trade, which is an area of the law that has been uniquely federal since the beginning of the Republic. Dkt. 58. According to SSI, the hooks were approved pursuant to extensive regulations promulgated by the U.S. Coast Guard ("USCG") relating to the safety of individuals and property on board vessels subject to its inspection. *Id.* These regulations relate to the design, construction, alteration, repair, and operation of lifesaving equipment. *Id.* Diamond argues that (1) it is not even clear that the hooks were appropriately approved by the USCG; (2) regardless, the hooks open while on-load and thus are in violation of USCG regulations; (3) Texas law governs under the contract or contracts so federal law cannot govern; (4) controlling case law from the U.S. Supreme Court indicates that USCG regulations do not preempt state tort law; (5) SSI has failed to overcome the presumption against preemption; and (6) SSI has not met its burden of showing that Congress clearly intended to preempt claims like Diamond's. Dkt. 76.

SSI moves, in the alternative, for partial summary judgment on Diamond's claim for damages arising from settlements of tort claims resulting from the accident. Dkt. 58. SSI claims that Diamond's claim for settlement damages is in reality a common-law indemnity claim, which is not available under Texas law. SSI additionally argues that Diamond has actively committed acts of negligence, including failing to train the helmsman and other personnel, and any amounts paid in settlement were for a violation of Diamond's own duties. *Id.* SSI also argues that even if the Triple5

hooks were defectively designed, it was not reasonably foreseeable that Diamond would voluntarily

pay claims it did not owe for injuries caused by the hooks. *Id.* Diamond argues that its claim for

damages associated with its settlement of the personal injury and death claims is appropriate because

the settlement was a foreseeable consequence of SSI's conduct and that it had to settle to mitigate

its damages.

## II. MOTION TO DISMISS

### A.   Legal Standard

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the

claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what

the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

127 S. Ct. 1955, 1964–65 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99 (1957)).

In considering a 12(b)(6) motion to dismiss a complaint, courts generally must accept the factual

allegations contained in the complaint as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale

Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). The court does not look beyond the face of

the pleadings in determining whether the plaintiff has stated a claim under Rule 12(b)(6). *Spivey v.

Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). "[A] complaint attacked by a Rule 12(b)(6) motion

to dismiss does not need detailed factual allegations, [but] a plaintiff's obligation to provide the

'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964–65 (citing

*Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994)) (internal

citations omitted). And, "[f]actual allegations must be enough to raise a right to relief above the

speculative level." *Twombly*, 127 S. Ct. at 1965.  The supporting facts must be plausible—enough to raise a reasonable expectation that discovery will reveal further supporting evidence.  *Id.* at 1959.

In addition to meeting the plausibility standard, under Federal Rule of Civil Procedure 9(b), if a party is alleging fraud or mistake, the pleading must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (noting that Rule 9(b) does not "supplant" Rule 8(a)).  However, this particularity requirement "does not 'reflect a subscription to fact pleading.'" *Id.* (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)).  Instead, pleadings alleging fraud must contain "simple, concise, and direct allegations of the circumstances constituting the fraud, which . . . must make relief plausible, not merely conceivable, when taken as true." *Id.* (internal quotations omitted) (referring to the standard enunciated in *Twombly*).

The Fifth Circuit interprets Rule 9(b) strictly, "requiring a plaintiff pleading fraud to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Id.* (quoting *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002)).  Thus, Rule 9(b) generally requires the complaint to "set forth 'the who, what, when, where, and how' of the events at issue." *Id.* (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).  However, "Rule 9(b)'s ultimate meaning is context-specific." *Grubbs*, 565 F.3d at 185.  Thus, "[d]epending on the claim, a plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' without including all the details of any single court-articulated standard—it depends on the elements of the claim at hand." *Id.*

6

**B.     Analysis**

Diamond moves for dismissal of SSI's remaining counterclaims because Diamond argues that they all hinge on the same alleged wrongful conduct—the Flash Alert—which the court has already ruled does not provide false and misleading information.   Dkt. 47.   SSI argues that Diamond's motion is too narrowly drawn in that the Flash Alert is only one example of the alleged wrongful acts and omissions of Diamond.  Dkt. 54.  Diamond asserts that any other acts or omissions alleged by SSI are too conclusory or vague to state a claim.  Dkt. 60.

The original counterclaim states that Diamond "libeled, slandered, disparaged and defamed [SSI] . . . and such libel, slander, disparagement and defamation damaged [SSI] in an amount in excess of the minimum jurisdictional limits of this Court."  Dkt. 5.  The amended counterclaim,[1] which incorporates the original counterclaim and contains significantly more allegations and causes of action, alleges that Diamond "commenced a campaign to damage and discredit SSI and the Triple 5 hooks in the maritime life-saving equipment community," that Diamond knew its "claims and accusations suggesting or inferring that the fatal accident in Brazil was caused by defects in the design and manufacture of Triple 5 hooks" would harm SSI, and that the "Flash Alert, and other acts and omissions of Diamond, its officers, employees, agents and persons or entities acting for or on behalf of Diamond which will be shown at trial, were part of a campaign to discredit the Triple 5

---

[1] SSI labeled its amended counterclaim "SSI's First Amending and Supplemental Counterclaim." Dkt. 15.  A "supplemental pleading" deals with "any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  Fed. R. Civ. P. 15(d).  SSI's "first amending and supplemental counterclaim" does not appear to deal with issues occurring after the date of the original counterclaim.  Instead, it appears to be an ordinary amended counterclaim.  "Generally, an amended [pleading] supersedes and replaces an original [pleading], unless the amendment specifically refers to or adopts the earlier pleading." *Eubanks v. Parker Cnty. Com'rs Court*, 44 F.3d 1004, at *2 (5th Cir. Jan. 3, 1995) (citations and quotations omitted).  Here, SSI specifically adopted its original counterclaim in its amended counterclaim, so the court will address the claims in each.  However, the court notes that it is a better practice to actually restate any claims one wishes to continue to pursue rather than adopting a previous pleading, as this practice makes clear which claims are still live claims.

hooks; to disparage and defame SSI and its products; and to cast SSI and its products in a false and harmful light in the worldwide maritime life-saving community." Dkt. 15.

First, the original counterclaim is entirely too conclusory to state a claim for which relief can be granted. The entire counterclaim consists of two paragraphs, and there is no indication if the claims are asserted under Texas law, California law, Louisiana law, or maritime law. *See* Dkt. 5. The original counterclaim essentially recites four broad causes of action, conclusorily states that Diamond committed the torts asserted and that SSI suffered damages as a result. *Id.* Entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964–65. Thus, any remaining claims from the original complaint are hereby DISMISSED for failure to state a claim for which relief can be granted.

With regard to the amended complaint, the court dismissed the defamation claims under California, Texas, Louisiana, and maritime law in its order granting in part Diamond's original motion to dismiss. Dkt. 30. The remaining claims from the amended complaint are (1) tortious interference with contract under California law, (2) tortious interference with prospective economic advantage under California law; (3) unfair business practices under California law; (4) negligence and "intentional tort" under Louisiana Civil Code article 2315; (5) intentional interference with contract under Louisiana law; (6) advertising injury under Louisiana law; (7) fraud under Louisiana law; (8) bad faith breach of contract under Louisiana law; (9) "intentional tort" under Texas law; (10) negligence under Texas law; (11) interference with contractual and prospective contractual relations under Texas law; (12) advertising injury under Texas law; (13) intentional and negligent misrepresentation under Texas law; (14) fraud and fraud by omission under Texas law; (14) breach

8

of contract under Texas law; and (15) potential causes of action—other than defamation—under maritime law. Dkt. 15.

### 1. Maritime Claims.

Counts 1 through 3 of the amended counterclaim assert claims under California, Louisiana, and Texas law. Dkt. 15. Count 4 attempts to assert claims under maritime law. This count asserts that "[o]ne of more of the causes of action set forth in Counts 1 through 3 above in favor of SSI are available to SSI under the general maritime law of the United States." Dkt. 15. This statement, and an incorporation of the factual allegations made in the counterclaim, is the entire substance of the maritime claims. It is not the court's burden to comb through the facts alleged to determine what causes of action SSI may have under maritime law. SSI's general statement that some of the claims asserted under Texas, Louisiana, and California law are also available under maritime law is insufficient to state those claims under maritime law. Accordingly, all of SSI's counterclaims under maritime law are hereby DISMISSED.

### 2. California Claims

Count 1 asserts four claims under California law—tortious interference with contract, tortious interference with prospective economic advantage, unfair business practices, and defamation. Dkt. 15. The court has already dismissed the defamation claim. *See* Dkt. 30. It will address the remaining California claims *seriatim*.

The elements of a tortious interference with contract claim under California law are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas*

9

*& Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 589-90 (Cal. 1990).  Tortious interference with prospective economic relations is related, requiring "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Youst v. Longo*, 729 P.2d 728, 733 n.6 (Cal. 1987).  A plaintiff asserting a claim for interference with prospective economic relations must plead "that the defendant's interference was wrongful by some measure beyond the fact of the interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 902 P.2d 740, 751 (Cal. 1995) (citations and quotations omitted).  SSI alleges that Diamond was aware of SSI's contracts and economic relationships, that its existing contracts and potential contracts for the sale and delivery of Triple5 hooks were negatively affected because of Diamond's conduct, and that SSI has been damaged and suffered economic loss as a result of Diamond's conduct.  Dkt. 15.  SSI additionally asserts that Diamond intended to cause and did in fact cause a disruption in SSI's relationships with businesses, companies, and maritime industry participants by its conduct, which inferred that the accident in Brazil was caused by defects in the design and manufacture of Triple5 hooks.  *Id.* Diamond argues that the court should dismiss the California interference claims because its prior order dismissing the defamation claims found that the Flash Alert was justified and not wrongful. Dkt. 47.  However, the court merely ruled that the Flash Alert was not defamatory.  *See* Dkt. 30.  The court finds that SSI has stated a claim for interference with contract and interference with prospective economic relations under California law.  Diamond's motion to dismiss these claims is DENIED.

The next California claim is for unfair business practices.  Dkt. 15.  Under section 17200 of the California Business and Professions Code, "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ."  Cal. Bus. & Prof. Code § 17200 (West 2008).  "The 'unlawful' practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made."  *Saunders v. Superior Court*, 33 Cal. Rptr. 2d 438, 441 (Cal. Ct. App. 1994).  "'Unfair' simply means any practice whose harm to the victim outweighs its benefits."  *Id.*  The "court must weigh the utility of the defendant's conduct against the gravity of the harm to the plaintiff."  *Motors, Inc. v. Times Mirror Co.*, 162 Cal. Rptr. 543, 546 (Cal. Ct. App. 1980).  The Second District California Court of Appeal has acknowledged that it is almost impossible to determine this at the pleading stage, and noted that if the initial pleading "states a prima facie case of harm, having its genesis in an apparently unfair business practice, the defendant should be made to present its side of the story.  If, as will often be the case, the utility of the conduct clearly justifies the practice, no more than a simple motion for summary judgment would be called for."  *Id.*  Here, SSI alleges that Diamond engaged in the dissemination of misinformation regarding the accident for the purpose of misleading purchasers of maritime equipment, that this was an unlawful business practice under section 17200, that Diamond wrongfully profited by misleading SSI's customers and regulators about the cause of the accident, and that SSI suffered and continues to suffer injuries due to loss of sales, reputation, and good will.  Dkt. 15.  The court finds that these allegations are sufficient to state a prima facie case of an unfair business practice under section 17200 of the California Business and Professions Code.  Accordingly, Diamond's motion to dismiss this claim is DENIED.

11

### 3. Louisiana Claims.

SSI next asserts several tort claims and a contract claim under Louisiana law. *See* Dkt. 15. Tort claims under Louisiana law stem from Louisiana Civil Code article 2315, which provides that every "act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code Ann. art. 2315(A). SSI asserts claims of negligence and "intentional tort" under this section. *See* Dkt. 15. To assert a claim for negligence under Louisiana law, a plaintiff must allege five separate elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendants's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element).

*Thibodeaux v. Trahan*, 11-0328, p. 2 (La. App. 3 Cir. 10/5/11); 74 So.3d 850, 853. SSI's negligence counterclaim fails at the first stage, as SSI has not alleged a duty. Thus, it has not stated a claim for negligence. Diamond's motion to dismiss the negligence claim under Louisiana law is GRANTED.

As far as the "intentional tort" claim, SSI asserts that Diamond's acts or omissions "constitute intentional tort under La. Civ. Code art. 2315" and that it is entitled to recover any and all damages it has suffered or will suffer as a result thereof. Dkt. 15. SSI cites *Cole v. State Department of Public Safety and Corrections* in support of its position that it has stated a claim for this unspecified intentional tort. In *Cole*, the Louisiana Supreme Court considered a claim for intentional battery—an actual defined tort. *See Cole*, 2001-2123 (La. 9/4/02); 825 So.2d 1134. Diamond points out in its motion to dismiss that "intentional tort" is not a cause of action, it is a category of causes of action. Dkt. 47. In its response to Diamond's motion, SSI asserts that it has

alleged that Diamond attempted to discredit SSI in the maritime life-saving equipment community through an intentionally conducted campaign, that it knew the hooks did not and could not spontaneously move under a static load, and that any statement to the contrary would cause immediate and irreparable harm.  Dkt. 54.  The court cannot even begin to analyze whether these allegations state a claim for some particular intentional tort since SSI has not stated *what* intentional tort it is claiming Diamond committed.  It is not up to the court to find a tort that the allegations fit.

SSI argues that Louisiana recognizes a *prima facie* tort when an injured party has a claim for damages for injuries suffered because of another's malicious conduct, even though harm did not result from a specific tort.  Dkt. 54.  In support of this position, SSI cites *Edmond v. Hairford*.  In *Edmond*, the Third Circuit Louisiana Court of Appeal considered a case in which the trial court dismissed a claim of malicious prosecution.  *Edmond*, 539 So.2d 815, 816 (La. App. 1989).  The plaintiff and defendant had been involved in a long-term relationship, and the defendant asked the plaintiff to hold a gold watch for him and then forgot about it.  *Id.*  The plaintiff broke up with the defendant later that night, and the defendant later demanded that the watch be returned.  *Id.*  When it was not immediately returned, the defendant—a police officer—had the plaintiff arrested.  *Id.*  The defendant later dropped the charges.  *Id.*  The plaintiff sued the defendant, and the trial court approached the case under a malicious prosecution theory of recovery.  *Id.*  The trial court rejected the claim because it found that the defendant had probable cause to believe that the plaintiff was not going to return the watch.  *Id.*  The plaintiff appealed, and the appellate court reversed, noting that a "plaintiff's petition need not allege a specific cause of action or contain a prayer for general or equitable relief," and a "court may grant relief to a party which the evidence justifies, and the court is not restricted to the relief prayed for."  *Id.* at 817.  While the petition likely did not state a claim for malicious prosecution, the court found that article 2315 "is broad enough to cover the tortious

conduct of defendant and justify recovery of damages" and determined that the evidence showed that defendant was liable for a false arrest and imprisonment claim under article 2315. *Id.* at 818-19.

Federal courts apply the Federal Rules of Civil Procedure, not state procedural rules. *Exxon Corp. v. Burglin*, 42 F.3d 948, 950 (5th Cir. 1995). Thus, parties must meet the federal pleading standards to survive a motion to dismiss. Here, SSI hopes to maintain a cause of action for an amorphous intentional tort based on Louisiana's lenient pleading standard with regard to section 2315. While Louisiana state courts may be tasked with weeding through all of the allegations to make them fit into claims, federal courts are not. If a party wishes to state a claim for a tort in federal court, it needs to specify which one so that the court can determine whether the allegations are sufficient to state a claim for that tort.[2] Diamond's motion to dismiss SSI's claim for "intentional tort" under Louisiana law is GRANTED and the claim is DISMISSED.

The next Louisiana claim is intentional interference with contract. Dkt. 15. Louisiana recognizes a very limited cause of action for tortious interference with a contract. *Petrohawk Props., L.P. v. Chesapeake La., L.P.*, 689 F.3d 380, 395 (2012). It originally recognized "only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person." *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228, 232-34 (La. 1989). The Fifth Circuit has recently extensively analyzed Louisiana jurisprudence with regard to this type of claim, and it determined that "the defendant must owe a duty to the plaintiff in order for the plaintiff to have a viable claim for tortious interference with contract." *Petrohawk Props.*, 689 F.3d at 396. This duty is narrowly drawn, as the Louisiana Supreme Court "explicitly refused

---

[2] The court notes that SSI did specify in its response to Diamond's motion to dismiss that fraud, *negligent* misrepresentation, and intentional interference with contract are all examples of intentional torts in Louisiana. Dkt. 54 at 15. This does not help. SSI fails to provide the court with the elements of these torts or explain why its bare-bones assertion that Diamond committed an "intentional tort" fits into these causes of action.

to adopt 'a rather broad and undefined tort in which no specific conduct is proscribed.'" *Id.* (quoting *9 to 5*, 538 So.2d at 234). Here, SSI provides barebones allegations that Diamond's actions or omissions "constitute interference with SSI's contractual relationships and SSI is entitled to recover any and all damages it has suffered or will suffer as a result thereof." Dkt. 15. SSI has not asserted that Diamond owed it a duty—and certainly not the narrowly drawn specific duty required by Louisiana courts. Thus, Diamond's motion to dismiss the intentional interference with contract claim under Louisiana law is GRANTED, and the claim is DISMISSED.

The next Louisiana claim asserted is "advertising injury" under Louisiana Civil Code article 2315. Dkt. 15. The court can find no indication that the Louisiana Supreme Court has adopted this tort, and SSI does not address the advertising injury claim in its briefing. The court therefore presumes SSI is not opposed to the dismissal of this claim. Diamond's motion to dismiss the advertising injury claim is GRANTED, and this claim is DISMISSED.

Next, SSI asserts a claim for intentional and/or negligent misrepresentation under Louisiana law. Dkt. 15. Under Louisiana law, the tort of negligent misrepresentation falls under Louisiana Civil Code articles 2315 and 2316, and the Louisiana Supreme Court has found that the broad language of those statutes "affords protection for persons damaged by the negligent acts of others sufficient to encompass a cause of action for negligent misrepresentation." *Daye v. Gen. Motors Corp.*, 720 So.2d 654, 659 (La. 1998). Negligent misrepresentation "cases are evaluated using the duty-risk analysis." *Id.* Under this analysis, the plaintiff "must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached." *Id.* The counterclaim alleges that Diamond's acts constitute negligent misrepresentation under Louisiana Civil Code article 2315 and that SSI is entitled to

15

recover damages it has suffered or will suffer as a result.  Dkt. 15.  SSI argues that the Flash Alert is alleged to be an example of the "campaign" that Diamond embarked upon after the accident in Brazil to discredit the Triple5 hooks, that Diamond knew when and after it issued the Flash Alert that the Triple5 hooks did not spontaneously open with the lifeboats in their davits, and that the "condition" shown in the photos in the Flash Alert was caused by Diamond's own failure to properly retrieve its lifeboats.  Dkt. 54.  Diamond argues that SSI failed to provide any well-pleaded facts that could establish any misrepresentation of a material fact, fails to plead that Diamond intended to deceive anyone, and fails to plead that anyone justifiably relied on any misrepresentation or that anyone's reliance resulted in injury to SSI.  Dkt. 60.  The only "false statements" discussed in the counterclaim relate to the Flash Alert.  As noted in the court's order on Diamond's first motion to dismiss (Dkt. 30), the Flash Alert merely reports on a condition that was discovered on certain lifeboats, documents this condition with photographs, and provides instructions for monitoring the lifeboats, handles, and hooks.  It does not provide false or misleading information.  Dkt. 30 (citing and discussing Dkt. 6, Exh. 3).  Thus, even if SSI had pled that Diamond owed SSI a duty not to disclose information about its hooks, it has not shown that there was a breach of that duty because it has not pled a "misrepresentation."  Any claim for intentional misrepresentation suffers from the same defect.  Thus, Diamond's motion to dismiss the Louisiana state claims for negligent and intentional misrepresentation is GRANTED.  These claims are DISMISSED.

The next Louisiana claim is fraud.  Dkt. 15.  Under Louisiana law, fraud "is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other party.  Fraud may also result from silence or inaction."  La. Civ. Code Ann. art. 1953.  "Fraud cannot be predicated on unfulfilled promises or statements as to future events."  *Johnson v. Unopened Succession of Alfred Covington,*

*Jr.*, 42,488, at p. 13 (La. App. 2 Cir. 10/31/07); 969 So.2d 733, 742.  "The elements of a Louisiana delictual fraud or intentional misrepresentation are: (a) a misrepresentation of a material fact, (b) made with the intent to deceive; and (c) causing justifiable reliance with resultant injury." *Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 627 (5th Cir. 1999).  "To find fraud from silence or suppression of the truth, there must exist a duty to speak or disclose information." *Greene v. Gulf Coast Bank*, 593 So.2d 630, 632 (La. 1992).

Here, SSI has not pled a misrepresentation.  SSI arguably pleads a suppression of truth by stating that Diamond failed to issue a follow up publication to the Flash Alert reporting the conclusions of the formal Brazilian investigation that allegedly exonerated the Triple5 hooks, but it does not plead that Diamond owed it a duty to speak or disclose this information.  Dkt. 15. According to the counterclaim, the Brazilian Maritime Authority determined that the "determining cause" of the accident in Brazil was "the incorrect adjustment of the Triple 5 Release Mechanism, motivated by the lack of access to technical material about the equipment to be operated, absence of training of the personnel embarked, faults in the safety management, as well as the lack of interest of these same professionals to request this material to the owner."  Dkt. 15 & Exh. 1.  The Brazilian Maritime Authority found that "there was no damage to the components of the Triple 5 Release Mechanism or the eyelet that provoked the accident in question."  *Id.*  These findings relate to the hooks on the lifeboats in *Brazil*.  The Flash Alert relates to a condition found on lifeboats in *Australia*.  SSI claims that Diamond "knew that the Flash Alert was materially false, misleading and intentionally deceptive and was designed to cause loss and damage to SSI" because if lifeboats are hoisted in accordance with the manufacturer's operating instructions, the hooks cannot shift position when stowed.  Dkt. 15.  The Flash Alert does not state *why* the hooks were opened more than the manufacturer's recommendation—it could have been because they were hoisted incorrectly.  The

Flash Alert does not place blame on the hooks, Diamond, SSI, or anybody. It merely reports the condition in which the hooks and release levers were found and notes what Diamond was doing about the issue at that point. *See* Dkt. 6, Exh. 3 (stating that the hooks were "open more than the manufacture's [sic.] recommendations," that "the release handles inside the lifeboats had shifted from vertical position . . . to a less than vertical position . . . ," that Diamond had reset the hooks to correct positions and attached pennant wires for safety, and that the hooks would be inspected every six hours "to verify hook stability.") The Flash Alert is not materially false or misleading on its face. And the Brazilian Maritime Authority's findings with regard to the hooks on the lifeboats in Brazil do not solve the mystery as to why the hooks in Australia were open. There is no allegation that Diamond determined why the hooks in Australia were open and failed to report so that SSI would suffer damages. Thus, SSI has failed to state a claim for fraud under Louisiana law. Diamond's motion to dismiss the Louisiana fraud claim is GRANTED, and the Louisiana fraud claim is DISMISSED.

The final claim under Louisiana law is bad faith breach of contract. Dkt. 15. Under article 1997 of the Louisiana Civil Code, an "obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." La. Civ. Code Ann. art. 1997. SSI argues that Diamond's acts and omissions constitute a bad faith breach of contract and that it is entitled to recover any and all damages suffered as a result, including attorneys' fees. Dkt. 15. In its response to Diamond's motion to dismiss, SSI clarifies that it is seeking damages for Diamond's alleged breach of the implied covenant of good faith and fair dealing in every contract. Dkt. 54. It points out that it is clear that a contractual relationship existed between Diamond and SSI and asserts that after the accident in Brazil, Diamond was motivated to discredit SSI's product in the hopes of

gaining some advantage.  Dkt. 54.  Diamond merely states that SSI "fails to provide any well-pleaded fact that Diamond breached any contract with SSI."  Dkt. 60.

First, it is clear that Texas law, not Louisiana law, governs the contractual claims in this case.  The terms and conditions that are incorporated into the purchase order specifically state that Texas law governs the order.  Dkt. 6, Exh. 1.  Thus, any breaches associated with the purchase of the hooks are governed by Texas law.  However, the court cannot consider evidence outside of the complaint—or in this case counterclaim—in a motion to dismiss.  The counterclaim does not actually refer to the contract between SSI and Diamond.  Thus, the court must move on to consider whether SSI has stated a claim under Louisiana law.

SSI fails to allege the necessary components of a claim under Louisiana law for breach of the covenant of good faith and fair dealing.[3]  Under Louisiana law, contracts "must be performed in good faith."  La. Civ. Code art. 1983.  Thus, "Louisiana recognizes an implied covenant of good faith and fair dealing in every contract."  *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997).  The "implied covenant of good faith performance of conventional obligations or contracts is not measured by a higher objective standard, but by a subjective standard.  A mere failure to fulfill an obligation, without a showing of intent or ill will, does not constitute a breach of good faith."  *Brill v. Catfish Shaks of Am., Inc.*, 727 F. Supp. 1035, 1041 (E.D. La. 1989).  If there is no enforceable contract, no covenant of good faith and fair dealing can be implied.  *Spillway Invs., L.L.C. v. Pilot Travel Ctrs. LLC*, No. Civ. A. 04-2451, 2005 WL 517498, at *7 (E.D. La. Feb. 22,

---

[3]  The first case SSI cites for the cause of action is *Dorsey v. Northern Life Insurance Company*.  The federal district court for the Eastern District of Louisiana applied Louisiana law to the tort claims in *Dorsey*.  *See Dorsey*, No. Civ. A. 04-0342, 2005 WL 2036738, at *6 (E.D. La. Aug. 15, 2005).  However, it analyzed the contractual claims under Washington law, which was the governing law chosen in the parties' contract.  *Id.*, at *4.  Thus, the breach of good faith and fair dealing claim was analyzed pursuant to Washington law and is not on point here.

2005).  Here, SSI has not adequately alleged the existence of a contract.  Thus, is has not stated a claim for breach of the covenant of good faith and fair dealing under Louisiana law.  Diamond's motion to dismiss this claim is GRANTED, and SSI's claim for breach of the covenant of good faith and fair dealing, which is phrased "bad faith breach of contract" in the amended counterclaim, is DISMISSED.

   4.   **Texas Claims.**

   Count 3 of SSI's counterclaim asserts claims under Texas law for intentional tort, negligence, interference with contractual relations, interference with prospective contractual relations, advertising injury, intentional and/or negligence misrepresentation, fraud and fraud by omission, defamation, and breach of contract.  Dkt. 15.  The court has dismissed the defamtion claim, and it will address the remaining Texas claims in turn.

   The first claim SSI asserts under Texas law is for "intentional tort."  SSI states that Diamond's acts or omissions "constitute intentional tort under Texas law and SSI is entitled to recover any and all damages it has suffered or will suffer as a result thereof."  Dkt. 15.  Diamond notes that there are some jurisdictions that accept an undefined "prima facie tort," but this type of claim is not recognized in Texas.  Dkt. 47.  SSI takes issue with Diamond's characterization of its "intentional tort" claim as a "prima facie tort," stating that "Diamond is not free to re-characterize the allegations in the Counter Claim.  Under Texas law, an intentional tort requires pleading a specific intent to inflict injury."  Dkt. 54.  Indeed, Texas law requires pleading a specific intent.  It also requires pleading a specific *tort*.  The court cannot determine whether SSI has stated a claim for an intentional tort without knowing which specific tort SSI is claiming Diamond committed.

   SSI cites *City of Waco v. Williams* for the proposition that "intentional tort" is a cause of action in Texas.  In *City of Waco*, the court analyzed whether the City of Waco was immune from

suit under the Texas Tort Claims Act ("TTCA").  209 S.W.3d 216, 219 (Tex. App.—Waco 2006, pet. denied).  The TTCA waives sovereign immunity in certain circumstances.  Tex. Civ. Prac. & Rem. Code Ann. § 101.021.  The TTCA does not apply to claims "arising out of assault, battery, false imprisonment, or any other intentional tort . . . ."  *Id.* § 101.057(2).  The *City of Waco* court noted that if "'a plaintiff pleads facts which amount to an intentional tort, no matter if the claim is framed as negligence, the claim generally is for an intentional tort and is barred by the TTCA.  A plaintiff cannot circumvent the intentional tort exception by couching his claims in terms of negligence.'"  *City of Waco*, 209 S.W.3d at 222 (quoting *Harris Cnty. v. Cabazos*, 177 S.W.3d 105, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.)).  The court found that the plaintiff's claims alleged an intentional tort and were thus excepted from the TTCA waiver.  *Id.* at 223.  Specifically, the court found that the claims of repeated tasering allege the intentional tort of *assault*.  *Id.*  While the *City of Waco* court did speak, at times, of "intentional torts" in general terms, in order to find that the intentional tort exception applied, it first found that the claims alleged constituted a specific tort—assault.  *City of Waco* therefore does not support SSI's contention that it may state a claim for "intentional tort" without specifying which tort it wishes to assert.  Diamond's motion to dismiss the generalized intentional tort claim is GRANTED, and the claim is DISMISSED.

The next Texas claim is negligence.  Dkt. 15.  Under Texas law, to assert a claim for negligence, one must allege "(1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach."  *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex. 1996).  SSI argues that the "Counter Claim specifically asserts that Diamond negligently intended to harm the business and reputation of SSI."  Dkt. 54.  The paragraph of the counterclaim SSI cites for this statement indicates that Diamond failed to issue a follow up publication, statement, or alert about its formal investigation of the facts alleged in the

Flash Alert even though it said it would do so and even though the Brazilian investigations exonerated the Triple5 hooks. *See* Dkt. 54 (citing Dkt. 15 ¶ 53); Dkt. 15 ¶ 53. This paragraph does not reflect a duty, breach, or damages. Thus, it does not assert a claim for negligence under Texas law. Moreover, the court cannot find any allegations of a duty anywhere in the counterclaim. Therefore, Diamond's motion to dismiss the negligence claim is GRANTED, and the Texas negligence claim is DISMISSED.

The next Texas claim is interference with contractual relations. Dkt. 15. To allege tortious interference, SSI must allege "(1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred." *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). SSI alleges that Diamond's acts or omissions constitute interference with SSI's contractual relationships and SSI is thus entitled to recover any and all damages it has or will suffer as a result. Dkt. 15. As noted above when discussing the California claim for interference with contractual relations, SSI has adequately asserted these elements. Diamond's motion to dismiss this claim is therefore DENIED.

The next Texas claim is interference with prospective contractual relations. Dkt. 15. Under Texas law, the elements of tortious interference with prospective contract are "1) a reasonable probability that the parties would have entered into a contractual relationship; 2) an intentional and malicious act by the defendant that prevented the relationship from occurring with the purpose of harming the plaintiff; 3) the defendant lacked privilege or justification to do the act; and 4) actual harm or damages resulted from the defendant's interference." *Garner v. Corpus Christi Nat'l Bank*, 944 S.W.2d 469, 477 (Tex. App.—Corpus Christi 1997). As noted above when discussing the California claim for interference with prospective contractual relationship, SSI has adequately pled

that Diamond interfered with prospective business relationships.  Diamond's motion to dismiss this claim is DENIED.

Next, SSI asserts a claim for advertising injury under Texas law.  Dkt. 15.  Diamond argues that there is no cause of action for "advertising injury" under Texas law, and SSI fails to respond to this argument.  *Compare* Dkt. 47, *with* Dkt. 54.  The court will construe SSI's failure to respond to the argument as agreement.  Therefore, Diamond's motion to dismiss the advertising injury claim under Texas law is GRANTED, and the claim is DISMISSED.

The next Texas claims are intentional misrepresentation, negligent misrepresentation, and fraud.  Dkt. 15.  Under Texas law, the elements of fraud are:

> (1) that a material representation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; and (6) that he thereby suffered injury.

*Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983).   The elements of a negligent misrepresentation are:

> (1) a representation is made by a defendant in the course of his business or in a transaction in which he has a pecuniary interest; (2) the defendant provides "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*Hagans v. Woodruff*, 830 S.W.2d 732, 735-36 (Tex. App.—Houston [14th Dist.] 1992, no writ).  These claims all require an allegation that the defendant provided false information.  Here, the Flash Alert merely reports a condition, and it contains photographs that indicate that the condition was not false.  SSI argues, without citation, that a representation may be false because it fails to disclose all

known facts. Dkt. 54. SSI asserts that nobody checked the lifeboats on the vessel in Australia before it left for its voyage, that Diamond issued the Flash Alert without giving SSI notice and an opportunity to investigate, and that when Diamond had found a different lifeboat with open hooks a year before, SSI had been notified, had investigated the incident, and had determined that the lifeboat had been improperly lifted with the handle in the red position and stored with the hooks partially opened. Dkt. 54 at 8 n.1. SSI characterizes the issuance of the Flash Alert in this case as resulting from a "witch hunt." *Id.* SSI, however, makes these allegations in its response to the motion to dismiss. They are not contained in the amended counterclaim and are thus irrelevant to the motion to dismiss. Diamond's motion to dismiss these claims is GRANTED, and these claims are DISMISSED.

SSI's final Texas claim is breach of contract. Again, SSI does not allege that it had a contract with Diamond in its counterclaim. *See* Dkt. 15. Diamond's motion to dismiss is therefore GRANTED and the Texas breach of contract claim is DISMISSED.

In sum, SSI's maritime claims, its Louisiana claims, and its claims for intentional tort, negligence, advertising injury, intentional misrepresentation, negligent misrepresentation, fraud, and breach of contract under Texas law, are all DISMISSED WITH PREJUDICE. The remaining claims in the counterclaim are interference with contract and interference with prospective economic relations under California law, unfair business practice under section 17200 of the California Business and Professions Code, and interference with contractual relations and prospective contractual relations under Texas law. Obviously, SSI will not be able to ultimately proceed on both California and Texas tort claims.[4]

---

[4] The parties will need to either agree which state's law applies to these remaining tort claims or will need to brief the issue before trial if they cannot agree.

### III. Motion for Summary Judgment

SSI moves for summary judgment on the basis that federal law preempts all of Diamond's claims. Dkt. 58. Alternatively, SSI moves for partial summary judgment on damages, arguing that Diamond may not recover amounts paid in settlement of personal injury claims. *Id.* Diamond argues that SSI has not met its burden of showing that Diamond's claims are preempted by federal law and that Diamond is entitled to recover all damages flowing from SSI's alleged bad acts. Dkt. 76. Diamond also objects to an affidavit that SSI submitted with its summary judgment evidence, claiming that any portions of the affidavit based on conversations with others are inadmissible hearsay. *Id.* The court will first address the evidentiary issue and will then turn to preemption and damages.

### A.      Objection to Beatty's Affidavit

Mark Beatty is the Executive Vice President of SSI, and Captain George Beatty is the CEO and President of SSI. Dkt. 58, Exh. 3. SSI provided an affidavit of Mark Beatty as part of its summary judgment evidence. *See id.* The affidavit states that the information contained in the affidavit "is based on [Mark Beatty's] personal knowledge and belief based upon review of records of SSI and in consultation with Captain Beatty." *Id.* Diamond objects to this affidavit as inadmissible hearsay to the extent that it is based on conversations with George Beatty. Dkt. 76 at 9. SSI points out that Mark Beatty has been designated as a corporate representative for SSI and argues that, as the corporate representative, he does not have to have personal knowledge of the facts to which he attests. Dkt. 86 at 6. Rather, he speaks as the corporation, asserting its knowledge, beliefs, and positions. *Id.*

Under Rule 56 of the Federal Rules of Civil Procedure, supporting and opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4) (2012); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005).  An "affidavit cannot affirmatively state that it is only based on 'information and belief.'"  *DIRECTV, Inc.*, 420 F.3d at 530 n.40.  "Statements made on information and belief do not constitute proper summary judgment evidence." *de la O v. Housing Auth. of City of El Paso*, 417 F.3d 495, 502 (5th Cir. 2005).  However, the affidavit need not expressly state that it is made on "personal knowledge." *DIRECTV, Inc.*, 420 F.3d at 530.  Rather, the court may infer from the affiant's position in the company and the nature of his or her participation in the matters to which he or she swore that the affidavit is made upon personal knowledge.  *Id.*  A custodian of records may testify about business records as a corporate representative.  *See Love v. Nat'l Med. Enters.*, 230 F.3d 521, 530 (5th Cir. 2000); *Green Tree Servicing, LLC v. United States*, 783 F. Supp. 2d 243, 254 (D.N.H. 2011).

Here, since Mark Beatty's affidavit is based on his personal knowledge and belief, his review of records of SSI, *and* his consultation with Captain [George] Beatty, it appears that Mark Beatty is mixing up admissible information based on his personal knowledge with statements made on information and belief.  *See* Dkt. 58, Exh. 3.  The statements made on information and belief based on Mark Beatty's conversations with Captain Beatty are hearsay and cannot be transformed into admissible evidence simply because Mark Beatty is a corporate representative.  If Mark Beatty attempted to testify about what George Beatty said at trial, is would not be admissible unless it was not offered for the truth of the matter asserted or one of the hearsay exceptions applied.  SSI would have to call George Beatty to testify if it wanted to offer evidence about which only George Beatty knows.  The same standard applies at summary judgment.  If SSI wanted to introduce evidence that was within George Beatty's personal knowledge rather than Mark Beatty's and vice versa, then it needed to submit two separate affidavits.

26

The court finds that it is impossible to determine whether the statements made in paragraphs 3, 4, 5, 7, and 8 are within Mark Beatty's personal knowledge.  Paragraph 6 deals with an attached document, which speaks for itself.  Accordingly, Diamond's objection to Mark Beatty's affidavit is SUSTAINED IN PART, and the court will not rely on paragraphs 3, 4, 5, 7, or 8.  However, the objection is OVERRULED to the extent it requests the court to not rely on paragraph 6 and the attached document.

**B.     Summary Judgment Legal Standard**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact.  *Id.* at 322.  If the moving party fails to meet this burden, then it is not entitled to a summary

judgment, and no defense to the motion is required.  *Id* .  "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Transamerica Ins. Co. v. Avenell* , 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting Fed. R. Civ. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant.  *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).  The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached.  *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).  However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts."  *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

## C.    Preemption

Congress has the power to preempt state law because, under the United States Constitution, federal law is the "supreme Law of the Land."  U.S. Const. art. VI, cl. 2; *Arizona v. United States*, __ U.S. __, 132 S. Ct. 2492, 2500 (2012).  While there are certain areas of the law that have historically been reserved for the states, "Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision."  *Arizona*, 132 S. Ct. at 2500-01. In some circumstances federal law preempts state law even if there is no express preemption provision.  Specifically, federal law impliedly preempts state law when Congress has deemed that an entire field "must be regulated by its exclusive governance"—"field preemption"—or when federal law actually conflicts with state law—"conflict preemption".  *Id.* at 2501.  In field preemption, courts may either infer a Congressional intent to displace state law when the "framework of regulation [is] 'so pervasive . . . that Congress left no room for the States to supplement it' or when there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"  *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146 (1947)).  In conflict preemption, state law is preempted when "compliance with both federal and state regulations is a physical impossibility" or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (citations and quotations omitted).

SSI argues that Diamond cannot recover for its breach of contract, breach of express and implied warranties, negligence/gross negligence, misrepresentation, fraud, and strict product liability claims because the claims are preempted by federal laws and regulations pertaining to the design and construction of lifesaving equipment and material to be used in maritime navigation, transport, and

trade.  Dkt. 58 at 9-10.  Specifically, SSI argues that the claims are preempted by 46 U.S.C. section

3306 ("Section 3306") and the regulations that the Coast Guard has promulgated under Section 3306.

Section 3306 states, in relevant part:

> (a) To carry out this part and to secure the safety of individual and
> property on board vessels subject to inspection, the Secretary shall
> prescribe necessary regulations to ensure the proper execution of, and
> to carry out, this part in the most effective manner for—
> (1) the design, construction, alteration, repair, and operation of those
> vessels . . .; [and]
> (2) lifesaving equipment and its use;
> . . . .
> (b)(1) Equipment and material subject to regulation under this section
> may not be used on any vessel without prior approval of the
> Secretary.

46 U.S.C. § 3306.  Pursuant to this section, the U.S. Coast Guard ("USCG") promulgated regulations

contained in 46 C.F.R. §§ 159, 160.  These regulations relate to the procedures by which the USCG

approves equipment and materials used in lifesaving devices.  *See* 46 C.F.R. §§ 159, 160.  Section

159 contains specific procedures for the application and approval of equipment.  46 C.F.R. § 159.

Section 160 deals specifically with the materials, testing, and approval of lifesaving equipment.  *Id.*

§ 160.  Under section 160.033-4, the mechanical disengaging apparatus must be inspected during

the course of construction.  *Id.* § 160.033-4.  The regulation requires specific tests that must

conducted, some of which must be conducted in the presence of an inspector.  *Id.*  While the court

has found that the affidavit SSI submitted relating to USCG approval of the Triple5 hook is mostly

inadmissible, SSI has provided admissible evidence indicating that the USCG approved SSI's

Lifeboat Release Mechanism, Model TF 555-110, on July 18, 2008.  Dkt. 58, Exh. 3, att.

Diamond argues first that it is not clear that the Triple5 hooks were properly approved by the

USCG and, even if they were properly approved, if the hooks open while on-load, the hooks are in

violation of USCG regulations.  Dkt. 76 at 1, 5.  Next, Diamond points out that its contract with SSI

30

indicates that Texas law governs any contractual or warranty disputes, so federal law cannot apply to those specific claims.[5]  Dkt. 76 at 5.  Third, Diamond argues that controlling case law indicates that the USCG regulations do not preempt state tort law.  Dkt. 76 at 5.  Fourth, Diamond argues that there is a presumption against preemption, which SSI has not overcome.  Dkt. 76 at 7.  Diamond argues that SSI has failed to show that Congress clearly intended to preempt claims like Diamond's.  Dkt. 76 at 8.

### 1.    Approval by Coast Guard

Diamond argues that it is not clear if the hooks were even approved by the USCG because SSI has a "practice of violating USCG regulations" or "obtaining forged or counterfeit USCG signatures."  Dkt. 76.  Diamond cites an internal SSI email in which an engineering manager at SSI states that the production group at SSI had previously had no accountability because the production manager was also the quality assurance person, and production and quality assurance worked "hand in glove to bambuzzle [sic.] USCG" with regard to another SSI product.  Dkt. 76, Exh. 1.  The engineering manager alleges that tests were conducted without a quality assurance or USCG representative present and suggests that SSI could not afford to "mess up even once on the Triple 5 hook."  *Id.*  It is not altogether clear from either the email or the deposition testimony cited, but it appears that the alleged bamboozling related to the ISO 9000, not the Triple5 hooks; the email appears to be attempting to stop any bamboozling with regard to the Triple5 hooks before it happened.  *See* Dkt. 76, Exhs. 1, 2.  The evidence does not show that the hooks were not

---

[5] SSI and Diamond entered into a series of Purchase Orders for the purchase of the lifeboat hooks, which included Diamond's Standard Terms and Conditions (the "Terms").  Dkt. 76, Exhs. 3, 4.  The Terms indicate that the purchase orders would be governed by the law of the State of Texas.  Dkt. 76, Exh. 3 ¶ 9.1.

appropriately approved by the USCG, particularly in light of the fact that SSI provides a certificate showing that the hooks *were* approved by the USCG. *See* Dkt. 58, Exh. 3, att.

Diamond next asserts that if the hooks open on their own while on load, notwithstanding the approval by the USCG, the hooks do not meet the statutory requirements for lifeboat hooks. Dkt. 76 at 2. Diamond does not explain, however, how this alleged failure relates to the preemption argument. If SSI's preemption argument is correct and the entire field is preempted by federal law, then Diamond's state law tort claims would be preempted whether the hooks were in compliance with USCG regulations or not. Federal law, rather than state law, would govern enforcement of the statutory requirements regarding lifeboat hooks.

### 2. Choice of Law

Diamond points out that purchase orders for the Triple5 hooks indicate that they are governed by the law of the State of Texas.[6] Dkt. 76. Diamond thus contends that its claims cannot be preempted by federal law because SSI agreed they would be governed by Texas law. *Id.* SSI argues that its position that federal law preempts state law is consistent with the choice of law clause in the purchase orders. Dkt. 86. It notes that Texas law may govern certain contractual or other issues, but that federal law must govern the design and production of the Triple5 hooks. *Id.* It asserts that the USCG regulations are mandatory and SSI cannot waive them. The court finds that the parties may not contract for state law to apply to claims that are preempted by Section 3306 and the regulations promulgated pursuant to Section 3306.

---

[6] SSI notes that the purchase orders Diamond attached as summary judgment evidence relate to the purchase of Triple5 hooks for the *Ocean Valiant*, not the *Ocean Ambassador*. Dkt.86. However, the purchase order attached to the complaint and thus part of the record, does not state that it is for a specific rig, and it incorporates the same terms and conditions. *See* Dkt. 31, Exh. 1. SSI has not argued that the purchase order attached to the complaint is not for the correct rig or that the purchase order for the hooks used on the lifeboats on the *Ocean Ambassodor* were different than the purchase orders for the *Ocean Valiant*.

### 3. Case Law

Both parties argue that established case law supports their positions on preemption. SSI relies mainly on *Ray v. Atlantic Richfield Co.* and *United States v. Locke* for its argument that the entire field is preempted. Dkt. 58. These cases relate to the preemptive effect of Title II of the Ports and Waterways Safety Act of 1972 ("PWSA"). In *Ray*, the U.S. Supreme Court considered whether the PWSA preempted a law enacted by the state of Washington regulating the design, size, and movement of oil tankers in Puget Sound (the "Tanker Law"). 435 U.S. 151, 154-55, 98 S. Ct. 988 (1978). Atlantic Richfield Company, which operated an oil refinery in the northern part of the Sound, brought a lawsuit on the day the Tanker Law became effective seeking a declaration that the statute was unconstitutional. *Id.* at 155-56. Specifically, Atlantic Richfield Company alleged that the Tanker Law was preempted by the PWSA and thus invalid under the Supremacy Clause of the U.S. Constitution. *Id.* at 156. Among other holdings, the Court found a portion of the Tanker Law requiring certain safety features in certain situations to be invalid in light of the PWSA and its regulatory implementation. *Id.* at 160-61. The Court noted that the "statutory pattern [of Title II of the PWSA] shows that Congress, insofar as design characteristics are concerned, has entrusted to the Secretary the duty of determining which oil tankers are sufficiently safe to be allowed to proceed in the navigable waters of the United States." *Id.* at 163. Thus, it intended national standards "that would foreclose the imposition of different or more stringent state requirements." *Id.* The Court stated that a "state law in this area . . . would frustrate the congressional desire of achieving uniform, international standards and is thus at odds with 'the object sought to be obtained by [Title II] and the character of obligations imposed by it . . . .'" *Id.* at 168 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146 (1947)). The Court, however, did not question that States may impose reasonable conservation and environmental protection measures on enrolled and registered

vessels and may enforce local laws having purposes that differ from the federal law, such as local smoke abatement laws. *Id.* at 164. "The purpose of the 'federal inspection statutes [was] to insure the seagoing safety of vessels [and thus] to affor[d] protection from the perils of maritime navigation . . . .'" *Id.* (quoting *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 445, 80 S. Ct. 813 (1960) (second alteration added)). The Court noted that the State of Washington's safety requirements were different and higher than those required by the PWSA, and held that the "Supremacy Clause dictates that the federal judgment that a vessel is safe to navigate United States waters prevail[s] over the contrary state judgment." *Id.* at 165.

*Locke*, like *Ray*, involved regulations enacted by the State of Washington. *See Locke*, 529 U.S. 89, 94, 120 S. Ct. 1135 (2000). The regulations at issue in *Locke* were passed after the *Exxon Valdez* oil spill in Prince William Sound, Alaska. *Id.* The Washington legislature hoped "to establish standards for spill prevention plans to provide 'the best achievable protection [BAP] from damages caused by the discharge of oil.'" *Id.* at 97 (quoting Wash. Rev. Code §§ 88.46.040(3) (1994)). To effectuate this purpose, it created the Washington Office of Marine Safety, which promulgated regulations governing tanker design, equipment, reporting, and operating requirements. *Id.* The International Association of Independent Tanker Owners brought suit, arguing that the BAP standards were preempted by federal law. *Id.* The Supreme Court pointed out that the Washington regulations are "in an area where the federal interest has been manifest since the beginning of our Republic and is now well established." *Id.* at 99. The Court determined that there was no presumption of non-preemption, as there is in cases involving areas of the law that States have traditionally occupied, because Congress had "legislated in the field from the earliest days of the Republic, creating an extensive federal statutory and regulatory scheme." *Id.* at 108. The State laws bore on "national and international maritime commerce," so there was "no beginning assumption

34

that concurrent regulation by the State is a valid exercise of its police powers." *Id.*  Instead, the Court asked first "whether the local laws in question are consistent with the federal statutory structure, which has as one of its objectives a uniformity of regulation for maritime commerce." *Id.* The Court reiterated that under *Ray*, Title II of the PWSA preempts any state laws dealing with design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of tanker vessels and there is "no room for state regulation of these matters." *Id.* at 111.  It pointed out, however, that it was "difficult to determine whether a pre-emption question is controlled by conflict pre-emption principles, applicable generally to Title I, or by field pre-emption rules, applicable generally to Title II," because there is some overlapping coverage between the two titles. *Id.*  A State regulation is only pre-empted by Title I if it conflicts with USCG regulations. *Id.* at 109-10.

To support its position that its claims are not preempted, Diamond relies on *Sprietsma v. Mercury Marine*, in which the U.S. Supreme Court noted that neither *Locke* nor *Ray* purport to preempt common-law claims. 537 U.S. 51, 69, 123 S. Ct. 518 (2002).  Rather, both cases deal with state regulations.  The *Sprietsma* case dealt with whether state tort claims for a death resulting from a boating accident in which the decedent struck the propeller of a jet-ski after falling overboard were preempted by the enactment of the Federal Boat Safety Act of 1971 ("FBSA") and the decision of the USCG not to promulgate a regulation requiring propeller guards on motorboats. 537 U.S. at 54. The plaintiff alleged that the jet ski was unreasonably dangerous because it did not have a propeller guard. *Id.* at 55.  The Court considered whether Congress meant to foreclose state common-law remedies when enacting the FBSA.  *Id.* at 68.  It noted that the FBSA, unlike Title II of the PWSA, does not require the Coast Guard to promulgate regulations, and that, regardless, *Ray* and *Locke* do not purport to preempt *common-law claims* under Title II of the PWSA, and the FBSA expressly

35

reserves these types of claims.  *Id.* at 69.  The Court stated that "the concern for uniformity does not justify the displacement of state common-law remedies that compensate accident victims and their families and that serve the Act's more prominent objective, emphasized by its title, of promoting boating safety."  *Id.* at 70.

Diamond additionally cites *Moore v. Brunswick Bowling & Billiards, Corp.*, *Wyeth v. Levine*, *MCI Sales & Service, Inc. v. Hinton*, *Damien v. Bell Helicopter Textron, Inc.*, and *Morris v. Cessna Aircraft Co.*—all cases in which courts have concluded that regulations and agency approval of products do not expressly or impliedly preempt state-law tort claims.  Dkt. 76 at 12.  In *Moore v. Brunswick Bowling & Billiards Corp.*, which is an FBSA case similar to *Sprietsma* but decided before *Sprietsma*, the Texas Supreme Court considered whether the FBSA preempts state tort law regarding a claim that a boat was defective because it lacked a propeller guard.[7]  889 S.W.2d 246, 247 (Tex. 1994).  Section 4306 of the FBSA prohibits states from establishing any laws or regulations that are not identical to the FBSA that relate to the items regulated by the FBSA.  *See* 46 U.S.C. § 4306.  Section 4311(g) of the FBSA contains a "savings clause" that states that compliance with the FBSA "does not relieve a person from liability at common law or under State law."  *Id.* § 4311(g).  The plaintiff argued that her claims were preserved under the savings clause, and the boat manufacturer argued that an award for the plaintiff's tort claim would be in direct conflict with the USCG's decision not to mandate propeller guards.  889 S.W.2d at 249.  The Texas Supreme Court noted that there is a presumption against preemption applied because the case involved the state's regulation of health and safety matters, and the court reasoned that the USCG's decision not to require propeller guards "does not reflect an intention to foreclose state tort liability" and that "the

---

[7] The plaintiff was injured by a propeller of a motorboat while she was swimming in the San Bernard River in Brazoria County, Texas.  889 S.W.2d at 247.

savings clause reflects that Congress was willing to tolerate some tension between the concept that uniform safety regulations should be established at the federal level and the concept that a state may nevertheless award tort damages for unsafe products." *Id.* at 252.  The court thus held that the state tort claims were not preempted by the FBSA.  *Id.*

In *Wyeth*, the U.S. Supreme Court considered whether a state-law failure-to-warn claim relating to a drug used to treat nausea was preempted by the federal Food Drug and Cosmetic Act ("FDCA").  555 U.S. 555 (2009).  The trial court determined that the plaintiff's injury would not have occurred if the label had an adequate warning.  *Id.* at 564.  The drug manufacturer argued that the federal Food and Drug Administration ("FDA") had deemed the warnings on the label to be sufficient, that the FDA had to approve the pre-market label of its drug and it could not change the label without FDA approval, and that the state-law claims relating to the label were thus preempted by federal law.  *Id.* at 560.  There is a clause in the FDCA regulating prescription drugs that indicates that state law will only be invalidated by the federal statute if there is a "direct and positive conflict." *Id.* (quoting 21 U.S.C. § 202).  The drug manufacturer argued that there was a conflict because it could not comply with both the federal label requirements and state-law duties.  *Id.* at 568.  However, the Supreme Court noted that there is a provision in the FDCA that allows a drug manufacturer to change its label prior to FDA approval of the change if it is doing so to add or strengthen an instruction in the label.  *Id.* at 568.  The Court thus concluded that it was not impossible for the drug manufacturer to comply with both federal and state requirements.  *Id.* at 573.  The drug manufacturer also argued that the FDCA was a floor and a ceiling for drug regulation, but the Court reasoned that if "Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history. . . . Its silence on the issue, coupled with its certain awareness of the prevalence of state

37

tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness." *Id.* at 574.

In *MCI Sales & Service, Inc. v. Hinton*, the plaintiffs, who were injured in a motorcoach crash, claimed that the motorcoach was defectively designed because it should have had seatbelts and a particular type of glazing material on the windows. 329 S.W.3d 475, 479 (Tex. 2010). The Texas Supreme Court considered whether the state tort claims arising from the crash were preempted by federal safety regulations that governed the performance of the motorcoaches and the types of window glazing that could be used on motorcoaches.[8]  In the trial court, a jury found that the lack of seatbelts and the lack of laminated-glass windows caused the plaintiffs' injuries. *Id.* at 481. The bus manufacturer argued on appeal that compliance with both the jury verdict and federal regulations was impossible. *Id.* at 482. Congress gave the Secretary of Transportation authority to prescribe motor vehicle safety standards in the National Traffic and Motor Vehicle Safety Act of 1966, and the Secretary delegated authority to the Administrator of the National Highway Traffic Safety Administration ("NHTSA"), which promulgated the Federal Motor Vehicle Safety Standards ("FMVSS"), including FMVSS 205 and 208. *Id.* at 483. Under FMVSS 208, the NHTSA requires safety restraints for the driver only. *Id.* at 484. The reason the regulation did not require passenger seatbelts is that surveys showed that few passengers would use seatbelts in intercity buses even if

---

[8]  A group of friends had chartered the bus to take them to Dallas, Texas for a concert. 329 S.W.3d at 480. When the bus driver attempted to change lanes, a car cut him off, and he attempted to avoid an accident by steering into the earthen median. *Id.* Unfortunately, the driver then lost control of the bus, and it crossed the median onto the other side of the highway. *Id.* It collided with a large sport utility vehicle, spun around, and ended up on its right side. *Id.* Then, it slid across the lanes and ended up in a ditch. *Id.* Most of the windows on the right side of the bus shattered, and some passengers were tossed from their seats and ejected out of the broken windows. *Id.* Five passengers died, and several were injured. *Id.*

they were provided.[9]  *Id.* at 484.  MCI argued that the NHTSA's failure to regulate was deliberate.

*Id.* at 489.  The Texas Supreme Court determined that unless an agency takes an additional step of

stating that "it will not allow regulation in [a particular area] as a matter of policy," a "decision not

to regulate has no preemptive force."  *Id.* at 491.  The court thus determined that the NHTSA did not

intend as a matter of policy to forbid any state requirement of passenger seatbelts in motorcoaches,

so the jury's verdict with regard to seatbelts was not preempted by federal law.  *Id.*

With regard to the window glazing, FMVSS 205 has specific requirements for glazing

materials for use in motor vehicles.  *Id.* at 486.  The NHTSA considered changing the requirements

prior to the bus accident, but concluded that no one type of glazing material was superior for all

situations.  *Id.* at 487.  The bus manufacturer in *MCI* complied with the requirements on FMVSS

205.  *Id.*  The manufacturer argued that the NHTSA provided a choice in standards when

promulgating FMVSS 205, and not allowing the manufacturer that choice was in direct conflict with

FMVSS 205.  *Id.* at 496.  The court, however, determined that the regulation was nothing more than

a minimum standard and thus did not preempt the jury's finding that the manufacturer should have

used laminated glass.  *Id.* at 497-98.  The court reasoned that "Congress generally intended the

federal safety standards to set a minimum standard for performance and allowed juries to determine

in particular cases if the vehicle manufacturer should have done more."[10]  *Id.* at 495.

---

[9]  "In August 2010, the NHTSA published a Notice of Proposed Rulemaking that calls for three-point seatbelts for passenger seats in new motorcoaches."  *MCI*, 329 S.W.3d at 485.  It did so because "several motorcoach crashes in 2008 ha[d] illustrated that motorcoach rollover crashes . . . can cause a significant number of fatal or serious injuries in a single event," and its research indicated that the installation of seatbelts was practicable and effective.  Federal Motor Vehicle Safety Standards; Motorcoach Definition; Occupant Crash Protection, 75 Fed. Reg. 50958-01, 2010 WL 3235927 (F.R.) (proposed Aug. 12, 2010) (to be codified at 49 C.F.R. pt. 571).  The proposed rule requires seatbelts on passenger seat on all motorcoaches manufactured three years after the publication of the final rule.  *Id.*  The NHTSA predicts that the rule will reduce the risk of fatal injuries in rollover crashes by 77 percent.  *Id.*

[10]  The other cases cited by Diamond also relate to state claims not being preempted because the federal regulations defined minimum standards only.  *Damian v. Bell Helicopter Textron, Inc.*, 352 S.W.3d 124, 137-38 (Tex. App.—Fort Worth 2011, pet. denied) (finding that even though there

None of the cases cited addresses the preemptory effect of the statute at issue in this case or whether it preempts state tort law.  *Ray* and *Locke* find field preemption with regards to statutes that require USCG regulation of tankers.  However, they only address preemption of state statutes and regulations—not state tort law.  The *Sprietsma* Court notes that *Ray* and *Locke* do not address whether the statute at issue in *Ray* and *Locke* preempts state tort law, but *Sprietsma* is about a different statute that gave the USCG discretion to regulate—rather than requiring regulation like the statute in *Ray* and *Locke* and the statute at issue in this case.  Moreover, the statute at issue in *Sprietsma* specifically reserved common-law remedies.  The statute here *requires* the USCG to regulate, and it does *not* reserve common-law remedies.  The question, then, is whether common-law remedies are impliedly preempted when the USCG is required to and does regulate and when there is no mention of common-law remedies in the statute.  First, the court notes that the design and construction of lifesaving equipment aboard these vessels is not an area of law states have traditionally occupied, so there is no presumption against preemption.  *See Locke*, 529 U.S. at 108. The court finds that, given the traditionally federal presence in this area and the extensive mandatory regulation of maritime safety equipment by the USCG, any state remedies relating to the design, construction, alteration, repair, and operation of those vessels subject to USCG inspection, lifesaving equipment aboard these vessels, and use of that equipment, are preempted by Section 3306.

---

were federal regulations for a Part 29 helicopter to be capable of landing after a bird strike, because there were "no federal statutes or regulations governing the minimum standards for bird-strike resistance in Part 27 helicopters . . . ," Texas common-law claims for design defect resulting from bird strike were not preempted); *Morris v. Cessna Aircraft Co.*, 833 F. Supp. 2d 622 (N.D. Tex. 2011) (noting that it could not "conclude that Congress clearly and manifestly intended the federal government exclusively to occupy the broad field of aviation safety" and holding that the "federal government's regulatory presence in the area of aircraft design and manufacture, while extensive, leaves room for the States' traditional role of compensating injuries based on common law products liability standards").

### 4.     Specific Claims

Diamond asserts claims for breach of contract, breach of express and implied warranties, negligence and gross negligence in the design and manufacture of the hooks, negligence and gross negligence in failing to warn, misrepresentation, fraudulent inducement, and strict products liability. Dkt. 31. SSI asserts that all of these claims are preempted because they are all premised on the design and performance of the Triple5 hooks, which were approved by the USCG. Dkt. 58 at 15. Specifically, SSI argues that the thrust of the complaint and all causes of action is that the Triple5 hooks are defective and deficient in their performance. *Id.* The court finds, however, that it is more appropriate to consider each claim and whether Diamond's particular allegations relating to the specific claim relate to the field regulated by the USCG—the design, construction, alteration, repair, and operation of those vessels subject to USCG inspection, lifesaving equipment aboard these vessels, and use of that equipment.

First, the court finds that the breach of contract and the breach of express and implied warranties claims are not entirely preempted. Diamond claims that SSI breached its contracts (the purchase orders) with Diamond and repudiated them and that Diamond revoked its acceptance of the Triple5 hooks. Dkt. 31. As far as the warranties, Diamond claims that SSI made express and implied warranties of good and workmanlike performance, merchantability, and fitness for a particular purpose. *Id.* The terms and conditions that were attached to the purchase orders indicate that the hooks would be "free from defect, of merchantable quality and fit for the intended purpose or use for which they [were] purchased to the extent such purpose is known to [SSI]." Dkt. 76, Exh. 4 ¶ 6.2. Diamond contends that to show SSI breached the contract, it need only show that the hooks were not fit for the intended purpose, not that they were defective, and that such a showing has nothing to do with the USCG's approval of the hooks. Dkt. 76. SSI argues that the entire field

is preempted because the USCG sets mandatory standards for the hooks and its regulations set the design and construction standards. Dkt. 86.  The court agrees that any claim for breach of warranties with regard to the design and construction of the hooks is preempted, but the regulations that have been presented to the court do not indicate that the USCG regulates what SSI tells its customers. Thus, to the extent SSI made promises that fall outside the scope of USCG regulations, the claims may stand.  Thus, SSI's motion for summary judgment on the breach of contract and breach of express and implied warranty claims is GRANTED IN PART AND DENIED IN PART.  It is GRANTED to the extent Diamond asserts that SSI breached the contract or warranties with regard to the design or construction of the Triple5 hooks, but it is DENIED to the extent Diamond asserts claims that fall outside the scope of USCG regulations.

Second, the court finds that the negligence and gross negligence in failing to warn, misrepresentation, and fraudulent inducement claims are not preempted for the same reasons.  While the USCG regulates the design and construction of the hooks and sets safety standards, Diamond has shown that there is a question of material fact as to whether SSI made representations about the hooks that fall outside the scope of the USCG regulations.  The USCG does not regulate what SSI tells its customers when they purchase hooks, and USCG approval of the hooks does not prevent SSI from advising its customers if it knows there are problems with its hooks.  *Cf. Wyeth*, 555 U.S. at 569-70 (finding that a drug manufacturer could have strengthened its drug label to warn about risks without first obtaining FDA approval, so a failure to warn claim was not preempted by the FDCA). Thus, the negligence and gross negligence in failing to warn claims, the misrepresentation claim, and the fraudulent inducement claim are not preempted.  SSI's motion for summary judgment on these claims is DENIED.

The remaining claims are negligence and gross negligence in the design and manufacture of the hooks and strict liability.  These claims go to the heart of what the USCG must regulate, and the court finds that they are thus preempted.  Accordingly, SSI's motion for summary judgment on Diamond's negligence and gross negligence claims as they relate to the design and manufacture of the hook and on Diamond's strict liability claim is GRANTED, and these claims are DISMISSED WITH PREJUDICE.

### 5.    Conflict Preemption

SSI argues that even if the court is unconvinced that the entire field is preempted, the issue relating to the design of the Triple5 hooks is preempted because if Diamond succeeds on any of its claims, it will result in a finding that the Triple5 hook is unsafe despite its compliance with federal law.  Dkt. 58 at 17.  SSI could not change its hooks to comply with the findings in this case without first receiving permission from the USCG; thus, it argues, it could not comply with the state and federal law simultaneously.  *Id.*  Since the court has found that field preemption applies to preempt the negligence and gross negligence in the design and manufacture of the hooks and strict liability claims, it need not address the conflict preemption argument with regard to those claims.  With regard to the other claims, the conflict preemption argument fails for the same reason that the field preemption argument fails.  SSI cannot alter the design of the hooks without USCG approval, *see* 46 C.F.R. § 160.033-5(d), but SSI has not provided the court with any regulations relating to representations SSI may make to its customers about the hooks.  Thus, SSI's motion for summary judgment due to conflict preemption is DENIED.

### D.    Damages

Diamond paid $2.7 million in settlement of personal injury claims to the widow of the U.S. crewman who was killed in the accident in Brazil ("Mrs. Anderson"), and it seeks reimbursement

of this settlement as part of its request for damages.  Dkt. 58.  SSI previously moved for dismissal of this aspect of Diamond's claim, arguing that Diamond's claims for damages arising from the settlement were simply common law indemnification claims in disguise—and common-law indemnification is not available under Texas law.[11]  Dkt. 5.  In its order addressing this argument ("January 26 Order"), the court ruled that Diamond could not assert a common-law indemnity claim, but it reserved ruling on whether Diamond could recover these damages as part of the damages for its tort and contract claims until the issue had been more fully briefed or developed at trial.[12]  Dkt. 30.  SSI now moves for summary judgment on the damages Diamond may recover in connection with its claims.  Dkt. 58.  SSI argues that (1) Diamond cannot recover settlement damages as a third party because it is not an *innocent* third party and it was not reasonably foreseeable that Diamond would volunteer to settle with Mrs. Anderson on SSI's behalf; (2) the settlement amount is not recoverable for breach of contract action anyway because it does not amount to expectancy, reliance, or restitution damages; and (3) the settlement amount is not recoverable for the alleged torts because it is not an "economic" injury.  *Id.*  Diamond argues that (1) the settlement with Mrs. Anderson was a foreseeable consequence of SSI's conduct; (2) there are questions of material fact with regard to the cause of the accident; (3) comparative fault questions

---

[11]  The purchase order for the hooks indicates that it "shall be governed by the law of the State of Texas, without regard to its conflict of law rules which would refer to another jurisdiction."  Dkt. 31, Exh. 1.  The parties appear to agree, at least with regard to the motion for summary judgment, that Texas law governs Diamond's claims if they are not preempted by federal law.

[12]  In its January 26 Order, the court noted that there are cases from other jurisdictions indicating that if the person seeking damages for settlement amounts has suffered independent harm as a result of the potential indemnitor's actions, then it may also seek the amount it paid in settlement that stemmed from those same actions because what the party is seeking in damages is "'not what defines its claims; the basis for liability is what defines the nature of the claims.'"  Dkt. 30 (quoting *In re Cendant Corp. Sec. Litig.*, 166 F. Supp. 2d 1, 10 (D.N.J. 2001)) (other citations omitted).  The court also noted, however, that briefing on these issues was incomplete.  *Id.*  SSI has now briefed the issue and points out that *Cendant* and the other cases cited by the court involve the federal securities law bar of contribution.  The court agrees that Texas has its own unique law with regards to contribution and indemnity and that these cases are not on point.

44

should be left to the jury and only apply to the negligence claim; and (4) Diamond did not voluntarily settle with Mrs. Anderson, it settled with Mrs. Anderson because it had a duty to mitigate its damages under Texas law and because it was protecting its own interests.  Dkt. 76.

While Diamond asserts that the amount it paid to settle Mrs. Anderson's claims is part of the damages it suffered as a result of SSI's alleged tortious conduct and contractual breaches, Diamond is in reality simply seeking reimbursement for the amount it paid to settle Mrs. Anderson's claims—either through indemnification or contribution.  As the court noted in its January 26 Order, common law indemnity is not available in this case because there is no contractual basis for indemnity, no indication that Diamond's liability is purely vicarious, and Diamond is not an innocent product retailer.  *See* Dkt. 30 at 5.  Similarly, under Texas law, "a defendant can settle only his proportionate share of a common liability and cannot preserve contribution rights under either the common law or the comparative negligence statute by attempting to settle the plaintiff's entire claim." *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 22 (Tex. 1987).  Thus, whether Diamond is an innocent party that volunteered to settle SSI's claims or a joint tortfeasor looking out for its own interests, it cannot, under Texas law, seek reimbursement for the settlement amount by simply reframing the claim as an element of its damages.

Diamond claims that it had to settle with Mrs. Anderson because under Texas law it has a duty to mitigate its damages.  Dkt. 76.  It asserts that it took the steps it believed were necessary and required under the law to mitigate the damages associated with SSI's breach of contract and breach of warranties, and that whether its attempt to mitigate was reasonable is a question for the jury.  *Id.* The court finds, however, that this is just another attempt to assert a claim for common law indemnity or contribution when these claims are not recoverable under Texas law.  While it is true that Diamond had a duty to mitigate its *own* damages relating to the accident, *see Great Am. Ins. Co.*

45

*v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995), it did not have a duty to mitigate *SSI*'s damages.

Because common law indemnity and contribution are not recoverable under Texas law when one defendant settles with the plaintiff, and the portion of Diamond's damage claim associated with its settlement with Mrs. Anderson is in reality a claim for common law indemnity or contribution, SSI's motion for summary judgment on that portion of Diamond's damage claim is GRANTED. Diamond's claim for damages associated with its settlement with Mrs. Anderson are DISMISSED.


## IV. CONCLUSION

Diamond's motion to dismiss (Dkt. 47) is GRANTED IN PART AND DENIED IN PART. It is GRANTED with regard to SSI's maritime claims, its Louisiana claims, and its claims for intentional tort, negligence, advertising injury, intentional misrepresentation, negligent misrepresentation, fraud, and breach of contract under Texas law. These claims are DISMISSED WITH PREJUDICE. It is DENIED with respect to SSI's interference with contract and interference with prospective economic relations under California law, unfair business practice under section 17200 of the California Business and Professions Code, and interference with contractual relations and prospective contractual relations under Texas law.

SSI's motion for summary judgment (Dkt. 58) is GRANTED IN PART AND DENIED IN PART. It is GRANTED with respect to Diamond's claims for breach of contract or warranties with regard to the design or construction of the Triple5 hooks, negligence and gross negligence with regard to the design and construction of the Triple5 hooks, and strict liability. These claims are preempted by federal law and are thus DISMISSED WITH PREJUDICE. It is, however, DENIED with respect to Diamond's claims for breach of contract or warranties to the extent these claims fall

outside of the scope of the USCG regulations and DENIED with respect to Diamonds claim for negligence and gross negligence with regard to failure to warn, misrepresentation, and fraudulent inducement.  Additionally, SSI's alternative motion for summary judgment on Diamond's damages claim is GRANTED.   Diamond's claim for damages associated with its settlement with Mrs. Anderson is hereby DISMISSED WITH PREJUDICE.

It is so ORDERED.

Signed at Houston, Texas on October 10, 2012.

Gray H. Miller
United States District Judge