# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| DIAMOND OFFSHORE COMPANY, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-11-1701 |
| | § | |
| SURVIVAL SYSTEMS INTERNATIONAL, INC., | § | |
| | § | |
| *Defendant.* | § | |

## ORDER

Pending before the court are (1) a motion to exclude the testimony of L.J. Gunter, Robert Kahak, Gregory Scheig, and Dennie Rygaard, filed by defendant Survival Systems International, Inc. ("SSI") (Dkt. 55); (2) a motion to strike SSI's expert reports filed by plaintiff Diamond Offshore Company ("Diamond") (Dkt. 57); (3) a motion to exclude the expert testimony of Kurt Vandervort filed by SSI (Dkt. 59); (4) a motion to strike SSI's untimely supplemental *Daubert* motion filed by Diamond (Dkt. 87), which refers to a supplement SSI filed to its motion to exclude the testimony of Kurt Vandervort (*see* Dkt. 82); and (5) a supplemental motion to strike SSI's experts (Dkt. 98). Having considered the motions, responses, replies, and applicable law, the court is of the opinion that SSI's motion to exclude (Dkt. 55) should be GRANTED IN PART AND DENIED IN PART, Diamond's motion to strike (Dkt. 57) should be GRANTED IN PART AND DENIED IN PART, SSI's motion to exclude Vandervort's testimony (Dkt. 59) should be DENIED, Diamond's motion to strike SSI's supplemental *Daubert* motion (Dkt. 87) should be DENIED, and Diamond's supplemental motion to strike SSI's motion (Dkt. 98) should be GRANTED IN PART AND DENIED IN PART.

# I. Background

This case arose on May 17, 2010, when the crew of the *Ocean Ambassador*, a mobile offshore drilling unit, was conducting lifeboat drills. Four crewmembers, Mauro Cesar Oliveria Salamao, Jorge Luis Barbosa Souza, Carlos Mango Batista Pereira, and Joshua Anderson were passengers in Lifeboat #2 during the drill. The lifeboat was suspended with Triple 5 hooks, which are manufactured by SSI. The Triple 5 hook is designed to use the weight of the lifeboat to hold the hook closed. Dkt. 6, Ex. 2. Diamond contends that the hook opened, causing the lifeboat to fall into the water below. Dkt. 31. Two of the crewmembers were killed in the accident, and the other two crewmembers were injured. Dkt. 6.

Diamond contends that the accident occurred because the Triple 5 hooks have a latent design defect that allows the hooks to open, even while bearing the full load of the lifeboat, and Diamond seeks to provide expert testimony supporting this position. Dkt. 31. SSI proposes to submit expert testimony that the hooks could have partially opened because the crew did not operate the release gear to launch the boat and maneuvered the boat while it was attached to the falls, and that the crew was not alerted to this issue because the release handle was missing. *See* Dkt. 57-3. The release handle was not on the lifeboat when it was recovered. *Id.*

Diamond has filed a motion to strike SSI's expert reports and bar the testimony of SSI's experts. Dkt. 57. SSI has filed a motion to exclude the testimony of Diamond's experts L.J. Gunter, Robert Kahak, Gregory Scheig, and Dennis Rygaard, and a separate motion to exclude the testimony of Kurt Vandervort. Dkts. 55, 59. Diamond filed a response to SSI's motions (Dkt. 75), and SSI filed a response to Diamond's motion (Dkt. 74). SSI filed a reply with regard to Diamond's response to its motion to exclude the testimony of Kurt Vandervort (Dkt. 81), and it filed a supplement to its

2

motion to exclude Vandervort's testimony on the same day (Dkt. 82).  It also filed a reply to Diamond's response to its motion to strike Diamond's other experts.  Dkts. 84, 85.  Diamond filed a reply to SSI's response to its motion to strike SSI's experts.  Dkt. 83.  Diamond then filed a motion to strike the supplement to the motion to strike Vandervort's testimony, claiming that it is merely a new motion to strike that was filed after the dispositive motion deadline.  Dkt. 87.  Then, *Diamond* filed a supplemental motion to strike SSI's expert reports.  Dkt. 98.  Before proceeding to the merits, the court notes that both supplements were merely supplements to motions already on file that were provided after receipt of new information.  *See* Dkts. 82, 98.  Diamond's motion to strike SSI's supplement (Dkt. 87) as untimely is therefore DENIED.

## II. Legal Standard

In cases where federal subject matter jurisdiction is based on diversity, state law governs substantive matters while federal law governs procedure.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817 (1938); *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 395 (5th Cir. 2003).  Admissibility of evidence is a procedural matter.  *Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178, 1182 n.7 (5th Cir. 1975).  The admissibility of expert testimony is therefore governed by the Federal Rules of Evidence.  Fed. R. Evid. 702; *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).

The Supreme Court of the United States acknowledged in *Daubert v. Merrell Dow Pharmaceuticals* that Federal Rule of Evidence 702 serves as the proper standard for determining the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597–98, 113 S. Ct. 2786 (1993).  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Under *Daubert*, a trial court acts as "gatekeeper," making a "preliminary assessment of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93; *Kumho Tire v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167 (1999); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (5th Cir.2002).  *Daubert* and its principles apply to both scientific and non-scientific expert testimony.  *Kumho Tire*, 526 U.S. at 147.  Experts need not be highly qualified to testify, and differences in expertise go to the weight of the testimony, rather than admissibility.  *Huss*, 571 F.3d at 452.  Nonetheless, courts need not admit testimony that is based purely on the *ipse dixit* of the expert.  *Gen. Elec. Co. v. Joinder*, 522 U.S. 136, 146, 118 S. Ct. 512 (1997); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

In addition to being qualified, an expert's methodology for developing the basis of his or her opinion must be reliable.  *Daubert*, 509 U.S. at 592–93; *Moore*, 151 F.3d at 276.  Even if the expert is qualified and the basis of her opinion reliable, the underlying methodology must have also been correctly applied to the case's particular facts in order for her testimony to be relevant.  *Daubert*, 509 U.S. at 593; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007).  The party proffering expert testimony has the burden of establishing by a preponderance of the evidence that the challenged expert testimony is admissible.  *See* Fed. R. Evid. 104(a); *Moore*, 151 F.3d at 276. The proponent does not have to demonstrate that the testimony is correct, only that the expert is qualified and that the testimony is relevant and reliable.  *Moore*, 151 F.3d at 276.

4

### III. ANALYSIS

#### A.    Diamond's Experts

Diamond offers the testimony of several different experts—Kurt Vandervort, Lovelace James Gunter, Bob Kahak, Dennis Rygaard, and Greg Scheig—to support its position that the lifeboat accident occurred because the Triple 5 hooks have a design defect that caused the hooks to open when the lifeboat was onload.  Vandervort investigated the incident, inspected the hook design and operation, inspected the actual lifeboat and component remains from the accident, modeled the lifeboat motion, and devised a test plan to create a situation similar to the conditions on the date of the accident.  Dkt. 75.  Gunter, who is an approved U.S. Coast Guard instructor for Proficiency in Survival Craft, opines about the training of the crew onboard the lifeboat and the maintenance programs for the *Ocean Ambassador*'s lifeboats.  *Id.*  Kahak, who is a manager of engineered products at one of SSI's competitor companies, discusses the historical background for mechanical disengaging devices or hooks and the standard of care for these devices and concludes that the Triple 5 hook does not meet the standard of care.  *Id.*; Dkt. 55-4.  Rygaard performed an investigation to determine the root cause of the accident.  Dkt. 75.  Scheig discusses the damages in this case.  *Id.* SSI contends that none of these experts is qualified and that their opinions are neither reliable nor relevant.  Dkts. 55, 59.

#### 1.    Kurt Vandervort

Diamond engaged Kurt Vandervort of Stress Engineering Services, Inc., to help investigate and develop an understanding of the events on the *Ocean Ambassador* on the day of the lifeboat accident.  Dkt. 59-5.  Vandervort has a Ph.D. in mechanical engineering and has worked in engineering related jobs for more than 20 years.  Dkt. 75, Ex. 22.  Vandervort conducted numerous

static and dynamic tests on the Triple 5 hooks, reviewed extensive technical records and discovery, and traveled to Brazil to inspect the lifeboat and hooks from the *Ocean Ambassador* and compare them to other Triple 5 hooks.  Dkt. 75; Dkt. 59-5 (Report).

SSI argues that Vandervort's testimony should be excluded because Vandervort is a mechanical engineer, not a naval architect, and he relied on computations and simulations that he did not perform himself.  Dkt. 59.  Instead, Vandervort relied on data provided by Diamond and on computations and simulations performed by two of his associates—one of whom has a Ph.D. in mechanical engineering and the other associate holds a masters in mechanical engineering.  *Id.*  SSI also argues that Vandervort's methods are unreliable because the weight Vandervort used for the simulations was 2,000 pounds heavier than the lifeboat and was raised with a different type of wire rope than the lifeboat.  *Id.*  SSI also complains that Vandervort did not produce the underlying data, calculations, spreadsheets, computer programs, inputs, outputs, or methodology upon which his opinion rests.  Dkt. 82.  Additionally, SSI states that it discovered during Vandervort's deposition that there was a videotape of the testing, which SSI claims was intentionally withheld.  Dkt. 82.  The videotape was not turned in with Vandervort's report to counsel; instead, it was "buried" in a "multitude of documents produced in electronic format."  *Id.*  SSI claims this was a "tactic intended to interfere with [its] ability to challenge the findings of Diamond's expert."  *Id.*  SSI asserts that the video depicting the release of a 16,000 pound weight is highly prejudicial if the testing assumptions are not accurate, and there is no way to establish that Vandervort used reliable data and methodology to create the computer simulations since his associates or Diamond provided the data.  Dkt. 81.

Diamond argues that Vandervort is highly qualified and that the assistants upon whom he relied have advanced degrees in mechanical engineering.  Dkt. 75.  Diamond additionally argues that

the reasons for striking the witness espoused by SSI are insufficient to strike the witness—instead, they are topics for cross-examination. *Id.* Moreover, as far as SSI not having the underlying data, Diamond asserts that Vandervort "painstakingly simulated the actual conditions on the *Ambassador*," but that even if he did not, the point of his testing is that the hooks *can* open on their own when the lifeboat is on-load and the primary handle is in the green zone even though SSI claims the hooks cannot open on their own if the lifeboat is on-load and the handle is in the green zone. Dkt. 87. Diamond also states that it produced the sea-state data used by Vandervort via the daily-drilling toolpusher reports, ballast-control records via BCO logbook data, documents used to calculate rig motions and wave data used to model rig motions, computer programs and data, and the input and output for that data. *Id.*

First, the court finds that Vandervort's background as a mechanical engineer qualifies him to perform the tests and investigations Diamond asked him to perform. He is not testifying about the structural design of the lifeboat itself; rather, he is testifying about the hooks. While certainly SSI may point out to the jury that Vandervort is not a naval architect, this particular distinction goes to the weight of his testimony, not the admissibility. *Cf. Porter v. Am. Optical Corp.*, 641 F.2d 1128, 1138 (5th Cir. 1981) (finding that the fact that an expert was qualified as an expert toxicologist and not as a design expert "went to the weight of his testimony rather than to its admissibility").

Second, the court finds that the fact that Vandervort's associates or Diamond provided some of the underlying data and that Vandervort's associates contributed to the model does not disqualify Vandervort as an expert. Vandervort's associates provided opinions about the sea state, the rig motions, and the mathematical model of lifeboat movement. SSI claims that these items were critical to the model Vandervort designed, yet Vandervort indicated that he had no expertise in wave

train data or rig motion data.  Dkt. 81 (citing Dkt. 81, Ex. 1).  The individuals who provided Vandervort with the data needed for his model have not been offered as experts, so SSI is unable to cross examine them to determine whether their methods are reliable.  Diamond asserts, however, that whether the underlying data and model accurately simulate real-world conditions is irrelevant,[1] as Vandervort's testing demonstrates that SSI's hooks can open on their own, which shows that the hooks do not perform in the way SSI represented to Diamond that they would.  Dkt. 87.  The court does not believe that Vandervort's reliance on his assistants and the data provided by Diamond disqualifies him as an expert.  Any concerns SSI has about these issues may be addressed through cross examination.

Third, the court disagrees with SSI's contention that Vandervort's methods are unreliable or irrelevant.  SSI contends that Vandervort did not exactly simulate the conditions on the date of the accident.  Diamond, however, is attempting to show through Vandervort's testimony that the hooks can open on their own despite SSI's alleged assurances that they will not, so whether the conditions under which Vandervort tested the hooks are exactly the same as the conditions on the date of the accident is immaterial to whether his models and testimony will be of assistance to the jury.  Moreover, as with SSI's concerns about the underlying data, SSI may point out the differences in Vandervort's model and the actual conditions to the jury through cross examination.

Finally, it is unclear to the court what SSI hoped to accomplish by claiming that Diamond failed to produce the sea-state data and unfairly withheld the videotape of Vandervort's testing.  Diamond provided evidence that it indeed produced the data about which SSI complains.  *See*

---

[1]  Diamond claims, however, that the data and model did represent real-world conditions.  Dkt. 87.

Dkt. 87 & Exs.  And SSI acknowledges that Diamond produced the videotape two weeks after providing Vandervort's report.  *See* Dkt. 82.  Whether it was "buried . . . in a multitude of documents produced in electronic format" (Dkt. 82) is of little consequence to the court so long as it was timely produced.

SSI's motion to strike Vandervort's testimony is DENIED.

### 2.    L.J. Gunter

Diamond offers L.J. Gunter of J G Safety & Training Specialists LLC as an expert on training and maintenance of the lifeboats on the *Ocean Ambassador*.  Gunter has a B.S. in Behavioral Science from the University of Southwestern Louisiana and it the Director of UL Lafayette Marine Survival Training Center ("MSTC") at the University of Lafayette in Lafayette, Louisiana.  Dkt. 55-6.  Gunter opines that there was a comprehensive maintenance program in place for the *Ocean Ambassador* that included regular inspections and maintenance of the lifeboats, that the crew of the *Ocean Ambassador* was following its internal maintenance requirements for weekly, monthly, and routine maintenance, and that SSI's claim that the Triple 5 hook is superior because the weight of the lifeboat helps keep the hook closed is not supported by the facts because the hook can open when the weight of the lifeboat is on the hook.  *Id.*  He also opines about whether the operating handle of the Triple 5 control box and safety cover for the emergency ratchet were in place during the lifeboat launching drill.  *Id.*  Finally, he opines that SSI's claim that the Triple 5 hook is superior to other designs is not supported by the facts because the hook can open when the weight of the lifeboat is on the hook and that SSI breached its duty of care and acted negligently by failing to warn prior to the accident that the hooks could open or the release lever could shift.  *Id.*

SSI asserts that Gunter is not qualified to render the opinions in his report and that his proposed testimony is not supported by any empirical data or derived from reliable principles or methods. Dkt. 55. SSI argues that while Gunter has experience teaching a "hands on" session at the MSTC that includes the launch and release of a lifeboat along with hooking up and retrieval, he is not qualified because there is no Triple 5 hook at the MSTC and no training with regard to the Triple 5 hook. Dkt. 55. Gunter also does not teach the class on a regular basis. Dkt. 84. SSI asserts that Gunter's general experience in training for use of survival craft does not qualify him to testify about the maintenance or maintenance programs of any equipment aboard the *Ocean Ambassador* or other rig, as he has no qualifications or certification that indicate he has experience, training, or education regarding whether the maintenance programs in place at Diamond met any standard, were complied with based on some measurable standard, or have any bearing on a fact issue in this case. Dkt. 55. Moreover, SSI points out that while Gunter may have some generalized knowledge of lifeboat davits, winches, and release mechanisms, he has no knowledge or education regarding Triple 5 hooks. *Id.* In fact, he admitted during his deposition that he had never seen a Triple 5 hook before he was retained in this case. Dkt. 84 (citing Dkt. 84, Ex. 1 (Gunter's Dep.)).

Diamond asserts that the MSTC is the premier lifeboat-training facility in the United States. Dkt. 75. Diamond argues that Gunter, the director of MSTC, is approved by the U.S. Coast Guard to teach lifeboat and lifeboat release gear operation and maintenance and has trained students in lifeboat proficiency courses for the last 18 years. Dkt. 75. Prior to working at MSTC, Gunter was a rig safety representative and was responsible for the rig's maintenance of and drills involving lifeboats. *Id.* Gunter taught lifeboat proficiency to Joshua Anderson, the helmsman of the lifeboat on the date of the accident. *Id.* Thus, he knows exactly what Anderson was taught during his

lifeboat training.  *Id.*   Gunter also oversees the maintenance program at MSTC and is thus responsible for the maintenance of MSTC's lifeboats, release mechanisms, and davit systems.  *Id.* Additionally, before offering his opinion, Gunter reviewed the training records of the *Ocean Ambassador* crew, reviewed all lifeboat-related maintenance records since the day the Triple 5 hooks were installed, interviewed crew members and other relevant people, researched training and maintenance regulations, and reviewed operational records and other documents produced in discovery.  *Id.*

The court finds that Gunter is qualified.  While his experience may not be specific to Triple 5 hooks, he has extensive experience in lifeboat training, and the operation of davits, winches, and release mechanisms.  Moreover, he trained the helmsman of the lifeboat at issue, and he has reviewed the relevant maintenance records.  His lack of direct experience with Triple 5 hooks goes to the weight of the testimony, not its admissibility.

With regard to relevance and reliability, SSI asserts that Gunter does not provide any scientifically valid reasoning or methodology for his opinions.  Dkt. 55.  SSI argues that Gunter based his opinions on speculations that the deceased lifeboat helmsman and three Brazilian crew members on the lifeboat were experienced and well-trained, that the drill was being used to supplement their training in launch and recovery skills, and that they were following standard lifeboat launching procedures.  *Id.*  Additionally, SSI argues that Gunter draws several improper fact conclusions, including:

> (1) that the Triple 5 Release Mechanism Operation and Maintenance Manual was onboard the *Ocean Ambassador* at the time of the incident;

(2) that the operating handle and yellow safety cover for the emergency ratchet had not been removed and were most likely lost due to the severe damage caused by the accident and recovery process;

(3) that the poster aboard the *Ocean Ambassador* was not misleading and depicts a step-by-step procedure for launching the lifeboat with instructions in both Portuguese and English;

(4) that the Flash Alert issued by Diamond is an industry best practice utilized to point out conditions or incidents that are noted to prevent reoccurrences; and

(5) that SSI's allegations that the helmsman may have been unaware that the Triple 5 control box was missing its operating handle and may have unintentionally released the hooks using the emergency ratchet are unsupported by the facts and witness statements.

*Id.* With regard to the handle, SSI argues that the witness statements upon which Gunter relies are from witnesses who have now been deposed and only confirm their statements in part. *Id.* For instance, in Mauro Salomao's witness statement, he said that the primary release handle on the control box was in place during the drill, but in his deposition he stated that he did not see the primary release handle. *Id.* Jorge de Souza similarly said in his witness statement that the handle was in place but admitted in his deposition that he did not see the handle. *Id.*

Diamond contends that Gunter's opinion that Anderson was an experienced and well-trained helmsman is not speculative and is, in fact, supported by facts, including Anderson's actual training records and various licenses and certifications. Dkt.75. Additionally, Diamond states that Gunter's opinion that Anderson was trained on the Triple 5 hook is supported by the facts because Anderson attended a safety meeting during which a video of the Triple 5 hook operation was shown, the Barge Supervisor has confirmed that he and Anderson reviewed the operation of the SSI Triple 5 Hook System prior to the accident, and the maintenance records indicate that Anderson assisted in maintaining the Triple 5 hooks and other lifeboat equipment. *Id.*; *see* Dkt. 55-6 (discussing these facts). Next, Diamond contends that Gunter's opinion that Salamao, Pereira, and Souza were experienced and well trained is supported by the facts because (1) Salomao holds a license as a 2d

engineer, attended a proficiency course in survival crafts, was evaluated and found to be a competent operator of the Triple 5 hooks 6 months before the accident, took part in Job Safety Analysis review of launch procedures, and familiarized himself with the Triple 5 Hook system; (2) Pereira held a Bosun rating from the Brazilian Maritime Authority, attended proficiency training in survival crafts, and took part in the JSA for the launch procedure as well as weekly Abandonment drills; and (3) Souza was an Able Seaman (AB) and had been a seafarer for over 20 years, worked on many types of vessels, and participated in the pre-job training meetings. Dkt. 75; *see* Dkt. 55-6 (discussing the training and certifications of these individuals). Next, Diamond argues that Gunter's opinion that the drill supplemented training in launch recovery skills and that the crew was following standard lifeboat launching procedures is supported by the International Maritime Organization Annex rules and industry best practices, of which he is aware through his 20 years of experience with the MSTC. Dkt. 75. With regard to Gunter's conclusions that the manual was onboard and that the operating handle was present, Diamond contends that they are each supported by eye-witness testimony or interviews that Gunter cites in his report. *Id.* And with regard to Gunter's opinion that the poster was not misleading, Diamond notes that Gunter relied on his review of the poster, his knowledge of training and safety standards, and his experience training personnel in marine launch procedures. *Id.* As to Gunter's opinion that SSI's defense that the helmsman may not have been aware that the control box was missing its operating handle and may have unintentionally released the hook is not supported by evidence, Diamond notes that the opinion is supported by witness statements that the handle was present and because no abnormal circumstances were documented by anyone involved in the launch procedure. *Id.*

The court finds that these opinions are relevant and reliable. Gunter based these opinions on facts in the record as well as his years of experience. As far as SSI's contention that Gunter bases

his opinions on or draws improper factual conclusions, SSI may attempt to discredit Gunter's testimony through "[v]igorous cross-examination [and] presentation of contrary evidence," which are the "appropriate means of attacking" disputed evidence relied upon by experts. *Daubert*, 509 U.S. at 596; *see Pipitone v. Biomatrix,* Inc., 288 F.3d 239, 250 (5th Cir. 2002) ("The fact finder is entitled to hear [the expert's] testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which [the expert] relied are accurate."); *Nova Consulting Grp., Inc. v. Eng'g Consulting Servs., Ltd.*, 290 Fed. App'x 727, 733 (5th Cir. 2008) (relying on the same quote from *Daubert* and noting that it is not the role of the trial court to evaluate whether the facts underlying the expert's opinion are correct). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

SSI additionally argues that Gunter attempts to assert the following impermissible legal conclusion: that SSI breached its duty of care and acted negligently by failing to warn Diamond prior to the accident of the potential that the hooks could open and the release lever could shift and that a recovery pendant and interlock pin could have prevented the accident. SSI argues that this opinion is essentially telling the jury what result to reach. The court agrees. While under Federal Rule of Evidence 704 an expert's opinion is "not objectionable just because it embraces an ultimate issue," "questions which would merely allow the witness to tell the jury what result to reach are not permitted. Nor is the rule intended to allow a witness to give *legal* conclusions." Fed. R. Evid. 704(a); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). Here, Gunter's conclusion that SSI breached its duty of care and acted negligently is clearly a legal conclusion and should be excluded.

SSI's motion to strike Gunter's testimony is GRANTED IN PART in that Gunter may not testify that SSI breached its duty of care and acted negligently.   SSI's motion to strike Gunter's testimony is otherwise DENIED.

### 3.   Robert Kahak

Robert Kahak is a professional in the field of lifeboats and their release mechanisms. Dkt. 55-4.  He has been working in this field since 1974.  *Id.*  It is unclear whether he has any specialized degrees or training.  *See id.*  Kahak opines that the Triple 5 hook is not safe in an offshore environment because it allows the fall ring to move on the hook and the hook to adjust based on the location of the ring.  *Id.*  According to Kahak, environmental conditions can cause the hook ring to move, and when the hook responds to the moving ring, it can inadvertently open.  *Id.*  Kahak concludes that SSI failed to meet the applicable standard of care when it manufactured and sold the Triple 5 hook to the offshore community.  *Id.*

SSI argues that Kahak lacks the qualifications necessary to provide an expert opinion with regard to the design of a release mechanism in general and SSI's hooks in particular.  Dkt. 55.  On his resume, Kahak lists a broad range of skills in which he claims to be proficient, but he does not list how he came to be proficient in these skills.  Dkt. 55-4.  He does not appear to have a technical background.  *Id.*  Diamond argues that Kahak has almost 40 years of experience working with lifesaving appliance systems, specifically including lifeboats, davits and release mechanisms, and he is the manager of engineered products at Alexander Ryan Safety Co., a direct competitor of SSI's. Dkt. 75.  Diamond also notes that Kahak was involved in the establishment and maintenance of lifeboat-training centers at Texas A&M Galveston and the Marine Survival Training School at the University of Louisiana, Lafayette.  *Id.*

The court agrees with SSI that Diamond has not shown that Kahak is qualified to offer the opinions he has been offered to provide. While an expert may be qualified under Rule 702 by "knowledge, skill, experience, training, *or* education," the court is concerned with the fact that Diamond has given no information about Kahak's training or education and instead broadly asserts that he is an expert simply because he has worked in the field for numerous years. While it is clear that Kahak has knowledge about lifeboats, davits, and release mechanisms, as he has worked in production, sales, and is currently the manager of engineered products at one of SSI's competitors, there is no indication that he has the technical expertise to testify about what causes the Triple 5 hooks to open. The court therefore GRANTS SSI's motion and STRIKES Kahak's report and testimony.

### 4.    Gregory Scheig

Gregory Scheig is a certified public accountant and financial analyst with a bachelor's degree in petroleum engineering and a master's degree in finance and accounting from the University of Texas. Dkt. 75, Ex. 21. He also has an accreditation in business valuation and a certification in financial forensics. *Id.* Scheig has more than 20 years of consulting and valuation experience, concentrating on complex financial analyses. *Id.* His report involves Diamond's alleged economic damages. *Id.*

SSI argues that Scheig's report is not grounded in scientific, technical, or otherwise specialized knowledge that will assist the trier of fact. Dkt. 55. SSI contends that since Scheig only offers opinions about purchase price paid, lost revenue, and costs paid, and does not identify any scientifically valid reasoning or methodology for his opinions, his opinions are conclusory, and the jury is more than capable of reviewing the documents and drawing its own conclusions. *Id.* SSI also argues that if a CPA testifies about the amount of damages, it would "unfairly validate those

damages in the mind of the jury, simply because an expert was providing the numbers." Dkt. 85. Finally, SSI asserts that Scheig does not provide any information to explain why loss of revenue for a rig owned by Diamond Netherlands is damage to Diamond Offshore Company and that his opinion therefore lacks proper foundation and is unreliable. *Id.* SSI also points out that Scheig did not provide for depreciation of the lifeboat for years of service in his calculations including the cost of replacing the lifeboat or use the fair market value of the lifeboat at the time of loss. *Id.*

Diamond asserts that Scheig is eminently qualified to render the opinions in his report and that his report is much more than simple math—it details the steps he took to analyze numerous invoices, payments, adjustments, vessel lists, the charter contract and amendment, services contract, and settlement agreement to determine the economic damages suffered by Diamond. Dkt. 75. Diamond asserts that an average juror could not perform the calculations that Scheig performed. *Id.*

The court agrees with SSI that the calculations Scheig performed are not extremely complex; however, the court believes that the calculations are not so simple that they would be of no assistance to the jury. Scheig is qualified to testify about economic damages, and his testimony is relevant and reliable. Any issues SSI has with the numbers Scheig chose are grounds for cross examination. Accordingly, SSI's motion to strike Scheig's testimony is DENIED.

### 5.      Dennis Rygaard

Dennis Rygaard is currently the president and owner of Incident Investigation Services, LLC, which provides third-party Apollo RCA training or consulting services for various well-known companies. Dkt. 55-5. Apollo RCA is a structured method whereby one applies principles of cause and effect to determine the root causes that led to an effect or consequence. *Id.* Rygaard, who has been teaching the Apollo RCA method since 2003, opines about the root cause of the accident in Brazil. *Id.* Rygaard pursued the causes as to why some of the components of the lifeboat were

17

missing, proceeding down what he deemed to be the most likely causal paths and looking for data to support the findings. *Id.* He based his findings on information derived from eyewitness testimony provided by employees who participated in the drill and were either occupants in the lifeboat at the time of the accident or witnessed the accident and vessel recovery operations. *Id.* He also reviewed depositions. *Id.* He opines that the missing components were on board the lifeboat during the drill and became dislodged and fell out of the vessel during or after the accident due to various external forces including vibration and environmental conditions and/or the jolting and impact associated with the accident itself or during recovery, when the lifeboat fell at least two and possibly four times. *Id.*

SSI argues that Rygaard is not qualified to testify about the root cause of the accident because he has no education, background, or training in any technical field related to mechanical, structural, or other similar pursuits. Dkt. 55. Diamond argues that Rygaard is well-qualified to testify as to the root cause of the accident as he has over twenty years of experience in accident reconstruction using root-cause analysis and he has been a certified instructor of the Apollo RCA method for ten years. Dkt. 75. Rygaard has performed root-cause analyses for numerous industry and government agencies in 60-70 incidents involving injuries, fatalities, and maintenance issues. *Id.* Diamond additionally argues that courts routinely admit evidence of experts performing root-cause analysis. *Id.*

The court finds that Rygaard is not qualified to offer a root causes analysis in this case. While his background in the method is impressive, his report contains several technical opinions, and Rygaard does not appear to have any specialized technical background. Moreover, while the court believes that Rygaard's methods are of great use to companies attempting to ascertain the cause of accidents, it also believes that it is not the proper subject of expert testimony in this case as it

18

invades the province of the jury. Rygaard reviewed the evidence and witness statements, determined which scenarios were, in his opinion, more likely, disregarded scenarios that he felt were unlikely, and reached a conclusion. This is exactly what the jury will be asked to do. The court does not believe it is appropriate to sanction an "expert" to tell the jury how to evaluate the evidence. The jury is more than capable of evaluating this evidence on its own. Accordingly, SSI's motion to strike Rygaard's testimony is GRANTED.

**B.   SSI's Experts**

SSI's experts are Mark Beatty, James Nelson, and Robert Markle. Dkt. 57. Beatty is SSI's financial expert, Nelson is an engineer who tested the Triple 5 hooks for this case, and Markle worked for the U.S. Coast Guard for numerous years and is offered to testify about safety, training, and regulatory issues. Diamond moves to strike the testimony of all of these experts, claiming that their testimony is unreliable, irrelevant, and inadmissible because they do not provide the underlying data for their conclusions, they do not identify the documents they have reviewed in this case, they do not assert opinions using a sufficient degree of certainty, they are not qualified in the fields in which they offer opinions, and they rely on assumptions that are opposite to known facts. Dkt. 57. Additionally, Diamond argues that at their depositions, the experts indicated that they have no opinions whether SSI's hooks are fit-for-purpose, have a design defect, or meet U.S. Coast Guard regulations, no opinions on whether the Triple 5 hook can walk open and drop a lifeboat, and no opinions about what probably happened to cause the May 17, 2010 incident. Dkt. 98. Thus, Diamond argues that their opinions are of no value to the jury. *Id.*

**1.   Mark Beatty**

Mark Beatty is SSI's executive vice president. Dkt. 57. Beatty's expert report purports to "outline the points for the law suit filed by Survival Systems International (SSI) against Diamond

19

Offshore (Diamond)." Dkt. 57, Ex. 1.  It points to three actions allegedly taken by Diamond that caused damages to SSI, and it discusses the financial impact of these actions on SSI.  *Id.*  When Beatty testified at his expert deposition, he clarified that he was only offering expert testimony on the financial impact of Diamond's actions on SSI.  Dkt. 98, Ex. 3 at 79.

Diamond argues that Beatty is unqualified to be offered as a financial expert as he is not a CPA, not an accountant, and has never done accounting work.  Dkt. 98 at 8.  Diamond also argues that Beatty's opinions are neither relevant nor reliable.  Dkt. 83.  Diamond points out that Beatty never provides a complete calculation of SSI's alleged lost profits, and his conclusion that SSI lost profits as a result of some action on the part of Diamond is purely speculation.  *Id.* at 5.  According to Diamond, Beatty's  report contains no evidence that Diamond caused SSI to lose sales, and Beatty's opinion that SSI lost profits does not demonstrate a reasonably certain, objective determination of lost profits.

SSI argues that Beatty has a Bachelor of Science in Economics and a Masters in Business Administration, has over twenty years of experience, has founded two businesses, and is directly involved in the financial planning and day-to-day economics of SSI.  Dkt. 74 at 4.  SSI presents the court with a case in which the Texas First Court of Appeals in Houston, Texas determined that an expert who had a Ph.D. in economics, had taught a university course in corporate valuation, and often acted as a consultant preparing corporate valuations, could testify about the valuation of an employment contract.  Dkt. 74 (citing *KMG Kanal-Muller-Gruppe Deutschland GMBH & Co. v. Davis*, 175 S.W.3d 379, 390 (Tex. App.—Houston [1st Dist.] 2005)).  SSI points out that the fact that the expert was not a CPA did not mean he was not qualified.  *Id.*  It then notes that Beatty has a degree in economics, an MBA, and over twenty years of experience in the business world.  *Id.*

20

Additionally, SSI asserts that Beatty has direct knowledge of SSI's operations and financial affairs and is thus "more than qualified as a lay expert."[2]  *Id.*

"[O]pinions of estimated lost profits must, at a minimum, be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.  In addition, when lost profits are dependent on a plaintiff's lost contracts with customers, Texas law requires that such contracts be proved with reasonable certainty, both as to their existence and number."  *Great Pines Water Co., Inc. v. Liqui-Box Corp.*, 203 F.3d 920, 922-23 (5th Cir. 2000).  "Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered."  *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994).

Beatty's report indicates that "SSI had to postpone all marketing efforts on the Triple5 hook for approximately one year" due to Diamond's actions and thus "did not present the hook to any potential new customers."  Dkt. 57, Ex. 1.  His report further states that "SSI suffered damage due to the significant amount of senior management time that was absorbed, distracting from focus on, and growth of, the company."  *Id.*  Beatty provides tables in his report that demonstrate SSI's growth rate from 2006 and purport to provide an extrapolation of an internal four-year growth rate.  *Id.*  The tables indicate that SSI should have continued to grow at a certain rate in 2010 and 2011, and in actuality its revenue went down in 2010.  *Id.*  During his deposition, Beatty could not point to a single lost sale or lost contract that resulted from Diamond's actions.  Dkt. 98, Ex. 3 at 60.  Instead,

---

[2]  At this point, SSI has offered Beatty as an *expert witness* under Federal Rule of Evidence 702, not a *lay witness* under Rule 701.  The court is solely considering whether he is qualified as an expert under Rule 702.

he stated that the "majority of the losses . . . are things that we would have been able to achieve, attention we would have been able to give the business, sales we would have been able to make, and et cetera."  *Id.*  Additionally, he asserted that SSI chose not to make sales in order to "deal with issues around Diamond."  Dkt. 98, Ex. 3 at 61.  It appears that Beatty would not be able to demonstrate lost profits within a reasonable degree of certainty as required by Texas law.

Regardless, the court finds that Beatty is unqualified to testify as a financial expert.  While Beatty has an undergraduate degree in economics, and he knows a lot about the economics of SSI due to his position within the company, he does not have the expertise to testify as an expert with regard to calculations of lost profits.  He has, indeed, never actually performed the same type of analysis before.[3]  Dkt. 98, Ex. 3 at 25, 74-75.  He is not qualified to testify as an expert.[4]  Diamond's motion to strike Beatty as an expert is therefore GRANTED.

### 2.     James Nelson

James Nelson has a B.C.E., M.S., and Ph.D. in Civil Engineering and is the Dean of the College of Engineering at University of Texas in Tyler.  Dkt. 57, Ex. 2, Ex. 2.  He has been registered as a professional engineer in Texas since 1979 and is a registered engineer in two other states.  *Id.*  He has worked as an engineer at Exxon Company, the Offshore Company, Robert Reid Consulting Engineer, and Brown & Root.  *Id.*  He has served as expert witness in a case involving

---

[3]  Beatty asserts that he has performed similar analyses with regard to business interruption claims associated with Hurricane Katrina and the California wild fires, but this type of claim is somewhat different because it relates to an alleged reduction in business rather than a complete interruption.  Dkt. 98, Ex. 3 at 25.

[4]  The court notes that even though Beatty does not qualify to testify as an expert on these matters, "an officer or employee of a corporation may testify to industry practices and pricing without qualifying as an expert."  *Tex. A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 403 (5th Cir. 2003).

a conventional lifeboat, and he has extensive publications relating to free-fall lifeboats.  *Id.*  He has taught numerous engineering classes at several universities, including the following relevant classes: dynamic analysis of structures, design of steel structures, structural analysis, introduction to structural design, civil engineering measurements, matrix methods for structural analysis, numerical and approximate methods in structures, experimental stress analysis, design of offshore structures, advanced strength of materials, statics and dynamics, theory of structures, engineering mechanics of materials, and offshore and coastal structures.  *Id.*  He has also served as a member of the United States Delegation at the Subcommittee on Ship Design and Equipment of the International Maritime Organization since 1994.  *Id.*

Diamond argues that the court should strike Nelson's testimony because Nelson has never analyzed or tested lifeboat hooks before this case.  Dkt. 57 at 11.  Instead, his expertise relates to "free-fall lifeboats," which are not suspended by cables and hooks.  *Id.*  Diamond further argues that Nelson does not provide an adequate description of his testing methodology and that his conclusions are therefore not relevant and reliable under *Daubert*.  Dkt. 57 at 14.  Finally, Diamond contends that Nelson's report is unreliable because it runs contrary to known facts in the case, as he assumed the lift never stopped, yet the eye-witnesses stated that when the lifeboat was first raised from the water it stopped just out of the water and above the three foot swells so that the crew could check that the hooks were properly set and so that the crew could check to make sure the hooks and release handle were in their correct respective positions.  *Id.* at 15.

SSI argues that Nelson is qualified, as he has a B.C.E., M.S., and Ph.D. in Civil Engineering, is the Dean of Engineering and Computer Science at the University of Texas, Tyler, has engineering experience at Exxon Company, the Offshore Company, Robert Reid Consulting, and Brown & Root, and has performed consulting work, including structural design and lifeboat consulting, and

performed tests on forces on lifeboats for over thirty years.  Dkt. 74 at 6.  With regard to his methodology, SSI maintains that Nelson's report explains his methodology and also provides graphs and charts regarding the testing and evaluation of the hooks, and the appendices provide the numeric data to support his conclusions.  *Id.* at 7.  SSI further argues that Diamond's contention that Nelson's report is unreliable because it runs contrary to known facts is incorrect, as these alleged "known facts" were obtained from eyewitness testimony which has, in fact, been called into question. Dkt. 74 at 8.

First, the court finds that Nelson is qualified to testify as an expert about the testing of the Triple 5 hooks.  Although his prior expertise is focused primarily on free-fall lifeboats, he has taught numerous college classes relating to structural engineering.  The fact that his primary expertise is in free-fall lifeboats as opposed to lifeboat hooks goes to the weight of his testimony, not its admissibility.

Second, the court finds that Nelson's report is relevant and reliable.  Nelson describes evaluations in which the hooks were intentionally placed in a partially open condition or with the D-ring on the nose of the hook at the bow of the lifeboat to determine the effect of these conditions on the performance of the hook.  Dkt. 57, Ex. 2.  He also indicates that one evaluation was conducted with the hook fully reset, and that the boat was made to swing in both types of evaluations.  *Id.*  He provides his mathematical equations and the reasoning behind his choice of variables and the assumptions he had to make.  *Id.*  Diamond complains that the amount of swing on the lifeboat in Nelson's model assumes the lift never stopped, which is contrary to testimony of the survivors. Dkt. 57.  SSI points out that the eye-witness testimony has been "inconsistent at best" and provides examples of two crewmembers who had stated that the primary release handle of the lifeboat was in place in earlier statements but admitted to not seeing them during their depositions.  Dkt. 74 at

24

7-8. The court finds that this is a question best left for the jury. While the life boat may not have been swinging as much as the lifeboat in Nelson's model was swinging—an argument Diamond is free to present to the jury—the court finds that his model is still relevant and that his methodology is reliable.[5] Diamond's motion to disqualify Nelson is DENIED.

### 3.     Robert L. Markle

Robert L. Markle has a Bachelor of Science in mechanical engineering and a Master of Business Administration. Dkt. 57, Ex. 3. He worked for the U.S. Coast Guard in its Lifesaving and Fire Safety Division for 27 years. *Id.* He has been a delegate to the International Maritime Organization for more than 30 years. *Id.* Markle was one of the primary drafters of Chapter III, Lifesaving Appliances, of the International Convention for the Safety of Life at Sea (SOLAS), and its companion documents, the International Lifesaving Appliances Code, and the Recommendation on Testing of Life-saving Appliances. *Id.*

In his expert report, Markle discusses the regulatory environment for training and qualifications of crew, the regulatory environment for lifeboats, the testing specific to the Triple 5 release mechanism, and the Brazilian Maritime Authority report relating to the May 17, 2010, accident. Dkt. 57, Ex. 3. He concludes that the Triple 5 release mechanism was reviewed by the U.S. Coast Guard, tested under the supervision of the U.S. Coast Guard and the American Bureau of Shipping, and determined to comply with the requirements of SOLAS, the LSA Code, and the IMO Resolution MSC 81(70), that the release handle may have been missing at the time of the

---

[5] Diamond also asserts that Nelson ran other models but did not produce them. Dkt. 98. Diamond indicates that the other data has been lost, as SSI does not have it. *Id.* Diamond argues that this results in SSI's failure to meet *Daubert* requirements. *Id.* However, Diamond does not cite and the court is not aware of any cases indicating that lost data should result in the complete disqualification of an expert.

accident as it was not on the lifeboat when it was recovered after the accident, that a missing handle could mean the lifeboat was not in compliance with 10.5.1.3 of the MODU Code or 10.18 of the MODU Code, that the lifeboat was likely lowered into the water without releasing it from the falls because either the crew wanted to avoid having to reconnect the falls after the drill was over, or because a missing release handle would make it impossible to reconnect the hooks to the falls, even though they could have been released using the emergency release ratchet. *Id.* Markle also concludes that the instruction poster in Portuguese and English was seriously deficient because it did not describe the operation of the Triple 5 release mechanism and suggested that the emergency ratchet was to be used during practice and launching. *Id.* Ultimately, Markle concludes that the decision not to operate the release gear to launch the boat as well as maneuvering the boat while it was attached to the falls contributed to the accident because the hooks would have been repeatedly loaded and unloaded as the boat moved, which might have caused the hooks to partially open. *Id.* Even though the hooks were visually checked when the boat was lifted, the crew had little training on the Triple 5 release mechanism, so they likely did not know what to look for. *Id.* He also concludes that the release handle was either missing and the helmsman therefore was not alerted to the fact that the hooks had moved into a partially open position, as the release mechanism would have been in the red zone, or the helmsman was not sufficiently trained or familiarized with the operation of the hooks to know what the handle meant, or the helmsman demonstrated tragic disregard to his duties by not monitoring the position of the release handle. *Id.*

Diamond contends that Markle is not qualified to opine on safety and training issues relating to the incident as he discontinued working for the U.S. Coast Guard four years before the Triple 5 hook even existed and six years before SSI submitted documentation to the U.S. Coast Guard for approval of the Triple 5 hook. Dkt. 57 at 17. Moreover, Markle's field is mechanical engineering,

not safety, training, or operations of offshore rigs. *Id.* Additionally, Diamond points out that Markle is designated to testify about lifeboat safety training, yet the office for which he worked at the U.S. Coast Guard does not regulate lifeboat safety training. Dkt. 83 at 3.

SSI argues that Markle has over 25 years of experience as the senior most Coast Guard official and extensive first-hand knowledge of all the rules and regulations governing lifeboat hook safety and is thus highly qualified to render an opinion about lifeboat hook safety, training, and design. Dkt. 74 at 10. The court agrees that even if Markle was not working for the U.S. Coast Guard at the time the Triple 5 hook was approved, he has extensive knowledge of the rules and regulations upon which he relies to render his opinion. He is thus qualified to discuss the regulatory environment for approval of the hooks and safety regulations relating to lifeboats in general. He may also testify as to whether the instruction poster on board was deficient with regard to its description of and the proper use of the Triple 5 Release Mechanism. However, he does not appear to have expertise in lifeboat safety training. Thus, to the extent he is being offered to testify about the adequacy of training, he is not qualified. He may testify about which regulations are relevant and what they require as far as how often training was to occur, but he may not offer an expert opinion as to whether the training actually received was adequate.

Diamond also contends that Markle's opinions do not meet the *Daubert* standards of relevance and reliability as they are all unsupported, contrary to known facts, and fail to assert that any aspect of his conclusions are "more likely than not." Dkt. 57 at 18. Diamond's main concern is that Markle's conclusions flow from his theory that the primary release handle may have been missing at the time of the accident, which is contrary to eyewitness testimony. *Id.* One of these witnesses specifically remembers the handle was in the green zone when the boat was lifted just out of the water for the standard re-check. *Id.* (citing Dkt. 57, Ex. 9 at 131-133). SSI argues that the

eyewitness testimony is inconsistent and whether the handle was missing is a disputed issue of fact. The court agrees that whether the handle was missing is an issue of fact.

Diamond also argues that Markle opines only about his different theories for what may have happened, but fails to assign percentages of likelihood to any potential scenario or say which was probable, and that his opinion thus fails to meet the *Daubert* standard. Dkt. 98 at 6. Under *Daubert*, the court may disregard expert testimony if it "concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true." *Daubert*, 509 U.S. at 596. Markle essentially opines that it is probable that the handle—whether it was there or not—was not used in the manner in which it was designed to be used. Given the fact that the handle was missing when the lifeboat was raised and the fact that the eyewitness testimony is not altogether consistent, the court finds that a reasonable juror could conclude that it is more likely than not true that the handle was either missing or not used in the manner in which it was designed to be used.

Finally, Diamond contends that Markle inappropriately relied on the Marine Casualty Investigation Report of the Brazilian Maritime Authority and Port Captaincy of Rio de Janeiro. Dkt. 83. Diamond relies on cases finding that experts may not rely on U.S. Coast Guard Marine Casualty Investigation Reports ("MCIR") because the U.S. Code provision providing for investigation of marine casualties bars the use of the reports in legal proceedings. *See United States v. Egan Marine Corp.*, 808 F. Supp. 2d 1065, 1076-77 (N.D. Ill. 2011) (striking summary judgment evidence that relied on an MCIR because using the MCIR as evidence violates 46 U.S.C. § 6308(a)); *Ward Hornblower Proescher*, No. C-1708, 1999 WL 694025 (N.D. Cal. Apr. 8, 1999) (concluding that a U.S. Coast Guard MCIR was "inadmissible as evidence for any purpose whatsoever pursuant to 46 U.S.C. 6308"). Thus, the reason that U.S. Coast Guard reports are inadmissible is because

Congress has deemed them inadmissible.  This has little bearing on the admissibility of MCIRs from the Brazilian Maritime Authority.  The court finds that it was not improper for Markle to consider the Brazilian report.

Diamond's motion to strike Markle's report because it is irrelevant and unreliable is DENIED.  Diamond's motion to strike Markle's report because he is not qualified is GRANTED IN PART AND DENIED IN PART.  It is GRANTED to the extent that Markle purports to be an expert with regard to the adequacy of training received by the individuals conducting the lifeboat drills.  It is DENIED in all other respects.

## IV. Conclusion

Diamond's motion to strike SSI's supplemental *Daubert* motion (Dkt. 87) is DENIED.  SSI's motion to exclude (Dkt. 55) is GRANTED IN PART AND DENIED IN PART.  It is GRANTED with regard to the motion to strike Rygaard's testimony and with regard to that portion of Gunter's testimony and report relating to SSI's alleged breach of its duty of care and acted negligently.  It is DENIED in all other respects.  Diamond's motion to strike (Dkt. 57) is GRANTED IN PART AND DENIED IN PART.  It is GRANTED with respect to Beatty's "expert" testimony and report and with respect to the extent Markle purports to be an expert with regard to the adequacy of training received by the individuals conducting the lifeboat drills.  It is DENIED in all other respects.  SSI's motion to exclude Vandervort's testimony (Dkt. 59) is DENIED.  Diamond's supplemental motion to strike SSI's motion (Dkt. 98), which merely supplements the original motion, is GRANTED IN PART AND DENIED IN PART.

Signed at Houston, Texas on January 29, 2013.

Gray H. Miller
United States District Judge